In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-1456

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TAVON A. UPTON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 05-CR-30115—**William D. Stiehl**, *Judge.*

ARGUED OCTOBER 26, 2007—DECIDED JANUARY 9, 2008

Before POSNER, FLAUM, and ROVNER, *Circuit Judges.*

FLAUM, *Circuit Judge.* A confidential informant told
the St. Clair County Sheriff's Drug Tactical Unit ("DTU")
that she could purchase crack cocaine from defendant-
appellant Tavon A. Upton at his home in Cahokia, Illinois.
On July 9 and July 15, 2003, under police supervision,
she did just that. Using the evidence from these con-
trolled buys, Investigator Timothy Bedard applied for
a warrant to search Upton's home and, on July 16, 2003,
Bedard and members of the DTU executed the warrant.
When he saw the DTU approaching, Upton bolted, discard-
ing two baggies containing cocaine base and cocaine as
he ran. The police soon caught up, arrested him, and
drove him—literally kicking and screaming—to the

police station, where he confessed to selling drugs out of his house. The search of Upton's home—producing an assortment of drug paraphernalia, digital scales, two knives, and a .380 caliber handgun—confirmed his confession.

An indictment followed and, on April 26, 2006, convictions for one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and one count each for possessing with intent to distribute cocaine base and cocaine in violation of 21 U.S.C. § 841(a)(1). The district court then sentenced Upton to 288 months' imprisonment, a 5-year term of supervised release, a special assessment, and a fine. Upton now appeals, challenging the admissibility of his confession, an officer's expert testimony given at trial, the jury instructions, and his enhanced sentence for being a career criminal. Finding no error, we affirm both his convictions and his sentence.

## I.  Background

### A.  Factual History

In July 2003, a confidential informant learned that Upton had been selling crack cocaine out of his home in Cahokia—a city in southwest Illinois on the border with Missouri—and contacted Officer Timothy Bedard. Officer Bedard was an officer in the Cahokia Police Department and the St. Clair County Sheriff's Drug Tactical Unit ("DTU"). On July 9 and again on July 15, 2003, under Bedard's supervision, the confidential informant engaged in two controlled buys of crack cocaine out of Upton's home. Using the information from these buys, Bedard obtained a search warrant for Upton's address and, the next day, Bedard and several other members of the DTU executed the warrant. When the DTU pulled up

to his home, Upton was standing in his driveway. Rightly guessing that the approaching battalion of police in riot gear was not a good sign, he took off running. The police caught him and recovered two plastic bags, containing what the police later determined to be 4.4 grams of cocaine and 4.8 grams of cocaine base.

For his part, Upton was not the model arrestee. While Bedard was initially reading him his *Miranda* rights, Upton began yelling that he was not going to return to prison. During the ensuing frisk, he became more aggressive, refusing to cooperate with the police and pulling away from and even kicking at the officers. And when the officers tried to put him in the squad car, he resisted their efforts—though they eventually succeeded.

Another Cahokia police officer, Phillip Taylor, and his partner then drove Upton to the police station. On the way, Upton's antics only worsened. After only a few blocks, he began kicking the squad car's side window and door with both feet, eventually causing the door and window to bow out. Taylor stopped the car, opened the door, and attempted to pacify Upton, but to no avail. Seemingly at a dead end, Taylor delivered what's called a "palm strike" in an effort to get Upton back in the car.[1] He was not aiming for Upton's nose—he testified that he was trying to hit Upton's torso. But when Upton lowered his head mid-strike, that's where his palm landed. Though errant, the move was successful. Upton abandoned his efforts to leave the car, and Taylor was able to close the door and continue on. After his booking, Taylor then tended to a cut on Upton's nose (the "palm strike" had produced a small laceration), which stanched the bleeding.

---

[1] A "palm strike" is an open-palmed punch in which the bottom part of the palm makes contact with the intended recipient. *See generally* Strike (attack), WIKIPEDIA, Nov. 20, 2007, http://en.wikipedia.org/wiki/Strike_(attack).

A few minutes later, another Cahokia police officer, Deputy Bill Kenny, transported Upton to the St. Clair County Jail. On the way, Upton told Deputy Kenny that he wanted to work as an informant for another Cahokia police officer whom Upton knew, Detective Kurt Eversman. The conversation did not go much further, and Kenny delivered Upton to the county jail.

While all this was going on, Bedard and the DTU had been searching Upton's residence. The fruits of the search confirmed suspicions that Upton had been dealing drugs: marijuana recovered from the kitchen and Upton's truck; cocaine from a kitchen cabinet; a digital scale with residue on it; boxes of plastic bags; bottles of prescription drugs not prescribed to Upton; a .380 caliber Tanfoglio firearm and ammunition; a police radio scanner; a large knuckle-knife with a steel-spiked handguard; and a switchblade. Bedard inventoried what the DTU had found and went to the county jail to question Upton.

Bedard, Detective Eversman, and another officer conducted the interview. Bedard first read Upton his *Miranda* rights a second time, but Upton refused to sign an acknowledgment form. Still, Upton answered the officers' questions, repeating his earlier offer to cooperate with the police in exchange for a lowered sentence. Upton then proceeded to make several incriminating statements. He confessed to selling drugs out of his home in order to support his child. And he also explained that he was a user; in fact, he had smoked crack just before his arrest, perhaps explaining his outburst in the squad car. When confronted with the fact that the police had removed a .380 caliber gun from his home, Upton admitted that he had handled it, but said that it belonged to a friend. At trial, the officers would testify that Upton was composed throughout the interview, and he did not give any outward indication that he was still in pain from his cut nose. Despite his apparent cooperation, at

the end of the interview Upton refused to sign a written statement memorializing his confession.

Upton never did end up identifying other drug dealers, and on April 5, 2006, a grand jury returned a five-count indictment against Upton charging (i) possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1); (ii) possession of cocaine base with intent to distribute in violation of 21 U.S.C. § 841(a)(1); (iii) possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1); (iv) possession of a firearm in relation to a drug-trafficking offense in violation of 18 U.S.C. § 924(c)(1); and (v) forfeiture of the firearm involved in a drug-trafficking offense pursuant to 18 U.S.C. § 924(d).

## B. Procedural History

Prior to his trial, Upton sought to suppress his post-arrest statements, claiming that his *Miranda* waiver had not been voluntary. To shore up his claim, Upton pointed to his injured nose and his refusal to sign a *Miranda* waiver. After briefing and a hearing, the district court denied Upton's motion. The court found that Upton had been "combative and uncooperative" and that he had received his bloodied nose "as a result of his behavior during his arrest and transportation to the Cahokia Police Department," not due to police overreaching. Further, Upton's efforts "to help himself by cooperating, essentially to stay out of jail" overshadowed any inference of police overreaching that could be drawn from a refusal to sign the *Miranda* waiver.

At trial, the government would prove its case against Upton through the testimony of the various officers involved in Upton's arrest, Upton's confession, and the physical evidence seized from his home. Upton objected to the fact that Officer Eversman would testify as both

an expert and a lay witness. Eversman had expertise on the drug trade, such as the use of firearms in drug trafficking, the tools of the trade, and why the amount of drugs seized from Upton's home indicated an intent to distribute. But he would also testify as a lay witness regarding Upton's confession, the controlled buys, the execution of the search warrant, and the particulars of Upton's arrest. Upton was concerned that the jury would not be able to separate the two kinds of testimony and noted this potential prejudice to the court. To obviate any prejudice, the government agreed to clearly separate Everman's expert and lay testimony. In addition, prior to his testimony, the court instructed the jury that "Lieutenant Eversman will testify as both a fact witness and an expert witness," to put them on guard. Finally, as promised by the government, the court took a twenty minute recess between Eversman's lay testimony and his expert testimony.

During Eversman's expert testimony, Upton objected to several questions posed by the government, claiming that they blurred the distinction between lay and expert testimony or were not helpful to the jury. The court sustained several objections, concluding that they were not helpful to the jury or that the government had asked a question going to fact testimony during Eversman's expert testimony. For example, the court sustained an objection to a question asking Eversman about the contents of Upton's confession during the expert portion of his testimony. The court also overruled objections to questions asking Eversman to comment on particular pieces of evidence. Thus, the government could not ask whether the location of the gun seized in the search of Upton's home was consistent with the location of firearms in other drug-related premises. And, in a sidebar, the court limited Eversman's expert testimony regarding the use of knives by drug dealers, permitting the

testimony in general terms but not allowing the particular knives to appear during the testimony.

As trial finished up, the parties moved to instructing the jury. Upton proposed two lesser-included-offense instructions of simple possession for both distribution counts. The district court denied Upton's request, stating that the evidence did not support simple possession. On April 26, 2006, the jury returned its verdict, convicting Upton of being a felon in possession of a firearm and both distribution counts, but acquitting him of possessing the firearm in relation to drug trafficking.

On February 21, 2007, the district court sentenced Upton to 288 months' imprisonment and five years' supervised release. The district court determined that Upton qualified as an Armed Career Criminal under 18 U.S.C. § 924(e). In so doing, the court was satisfied that Upton's prior convictions for aggravated battery, possession of a sawed-off shotgun, and three instances of domestic battery qualified as predicate offenses, and applied the enhancement. This appeal followed.

## II. Discussion

Upton's appeal focuses on the district court's pre-trial and trial rulings as well as the ultimate sentence imposed. Specifically, Upton challenges the voluntariness of his *Miranda* waiver, the admission of Eversman's expert and lay testimony, the district court's denial of the lesser-included-offense instructions, and his status as an Armed Career Criminal. The following sections discuss each in turn.

### A. Voluntariness of *Miranda* Waiver

On appeal, Upton reiterates his claim that his *Miranda* waiver had not been knowing and voluntary and that his

subsequent confession was thus inadmissible. Upton argues that the series of events surrounding his nose injury rendered his *Miranda* waiver involuntary. He points to the fact that he was cantankerous immediately after his arrest, but then became docile after the poorly landed "palm strike" injured his nose. Although Officer Taylor treated the cut on his nose, Upton did not receive any additional medical attention. Nor did a significant period of time pass between the injury and the interview in which he confessed. Finally, he points to his refusal to sign either an acknowledgment of his rights or a written statement during the interview.

When viewed in context, there is no indication that any of this affected Upton's *Miranda* waiver. This Court reviews de novo whether a *Miranda* waiver was voluntary and reviews the district court's findings of historical facts for clear error. *United States v. Smith*, 218 F.3d 777, 780 (7th Cir. 2000). A waiver can be either express or implied, *North Carolina v. Butler*, 441 U.S. 369, 375-76 (1979), and is involuntary if the will of the defendant "was overborne in such a way as to render his confession a product of coercion." *Spano v. New York*, 360 U.S. 315, 320-21 (1959). Waiver can never occur through "mere silence," as the *Miranda* warnings themselves indicate. *Butler*, 441 U.S. at 373. But a person can act as though he has waived his rights without expressly saying so. *Id.*

Upton impliedly waived his *Miranda* rights before he confessed. Granted he did not sign an acknowledgment form after Bedard read him his rights a second time. But he told the officers that he understood his rights, even requesting an attorney after he had confessed. And he did freely talk about the allegations against him, admitting they were true but attempting to strike a deal. *United States v. Smith*, 218 F.3d 777, 781 (7th Cir. 2000) ("[W]aiver may be inferred from the defendant's con-

duct, even when she has refused to sign a waiver form."). Thus, Upton understood what the officers had told him, but cooperated nonetheless, waiving his *Miranda* rights.

In addition, the circumstances surrounding his arrest and confession satisfy us that, despite the "palm strike," Upton's waiver was voluntary. Although physical force is certainly a defining circumstance—and possibly a dispositive one, *see Miller v. Fenton*, 474 U.S. 104, 109 (1985); *Brown v. Mississippi*, 297 U.S. 278 (1936)—its incidental use can sometimes be excused where the other incidents to the interview show a voluntary waiver. *Holland v. McGinnis*, 963 F.2d 1044, 1050 (7th Cir. 1992). The relevant inquiry is the totality of the circumstances, which does not lend itself to a neat list of factors. But in refining the standard, this Court has looked to gaps in time between the use of force and the waiver, changed interrogators or location, and renewed *Miranda* warnings. *Id.*; *see also Wilson v. O'Leary*, 895 F.2d 378, 385 (7th Cir. 1990). We have also looked to the defendant's background, experience and conduct. *United States v. Huerta*, 239 F.3d 865, 873 (7th Cir. 2001).

Upton's injury resulted in large measure from his own misconduct, not police efforts to coerce him into waiving his rights. *See Colorado v. Connelly*, 479 U.S. 157, 170 (1986) ("*Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that."). From the moment the police caught him, Upton was a pill. He was physical with the arresting officers when apprehended, refusing to get back in the car after the police frisked him and first read him his *Miranda* rights. When the police did succeed in getting him in the car, he began violently kicking the inside, eventually bowing out the side window and door. Officer Taylor's efforts to placate him were only met with more kicks. It

is understandable that in this context a police officer would have to resort to some proportionate measure of force to protect himself or subdue a suspect. This Court examines the effect of coercion from the perspective of a "reasonable person in the position of the suspect." *United States v. Brooks*, 125 F.3d 484, 492 (7th Cir. 1997). And a reasonable person acting as Upton was would not interpret the "palm strike" as the opening salvo in an effort to overbear his will. The resulting injury to Upton's nose is certainly unfortunate, but it did not result from police overreaching.

In addition, there was a clear break in the chain of events between the injury and the interview. *Holland*, 963 F.3d at 1050. After his injury, Taylor took Upton to the police station, treated his nose, and processed his arrest. And after that, Officer Kenny drove him to the county jail where the interview occurred sometime later, conducted by different police officers. The "palm strike" was just not an aspect of the interrogation in any meaningful sense. It occurred at a different time, involved different police officers, and was limited to responding to the defendant's outburst. *Id.* (noting relevant factors such as "the time that passed between confessions, the change in the place of interrogations, and the change in identity of the interrogators"). Granted Upton still bore the laceration from the injury during the interview. But he never requested further medical attention to treat his nose. And, according to the officers, he had all his wits about him throughout the interview. Importantly, before he confessed, Upton received a second *Miranda* warning, apprising him again of his right to be left alone if he wanted. *Id.* The effect and circumstances of the injury were simply too far removed to have affected the voluntariness of his waiver.

Finally, Upton's efforts to secure a better deal for himself show that he had a calculating and not a cowed mind at

the time of his confession. When traveling with Officer Kenny to the county jail, Upton first raised the prospect of cooperating to lessen his criminal exposure. Again during the interview, Upton raised the possibility of cooperating with Bedard and Eversman. As the district court found, his efforts to secure a deal coupled with his refusals to sign a written confession or an acknowledgment of his rights are telling. *See Smith*, 218 F.3d at 781 ("Smith's refusal to [sign a waiver form] shows her independent thinking and exercise of her free will. Her claim thus fails."). Upton's motivation was to stay out of prison, and he took actions calculated to achieve that goal. We thus affirm the district court's denial of Upton's motion to suppress.

### B. Officer Eversman's Testimony

Upton also argues that several questions posed to Officer Eversman failed to properly distinguish between his roles as an expert and lay witness. Upton concedes that the district court offered a cautionary instruction prior to Eversman's testimony and that his attorney probed the distinction between lay and expert testimony in cross-examination. But Upton argues that several government questions failed to highlight the exact capacity in which Eversman was testifying. For example, he points to questions posed to Eversman-the-expert concerning what Upton said after his arrest, a factual issue. The district court also restricted questions regarding whether the location of the gun in Upton's home was consistent with what Eversman had seen in other drug premises. Several other questions simply went beyond Eversman's capacity as an expert. Although the court sustained several of his objections, Upton claims these questions polluted the trial and require reversal.

Whatever potential prejudice may arise from dual expert and fact testimony, none occurred here. This Court

reviews a district court's decision to admit expert testimony for an abuse of discretion. *United States v. de Soto*, 885 F.2d 354, 359 (7th Cir. 1989). Police officers frequently testify as expert witnesses on drug trafficking, *see, e.g.*, *de Soto*, 885 F.2d at 359-60; *United States v. Gonzales*, 933 F.2d 417, 428 (7th Cir. 1991); *United States v. Foster*, 939 F.2d 445, 451-52 (7th Cir. 1990), and it is "still a reasonable assumption that jurors are not well versed in the behavior of drug dealers." *Foster*, 939 F.2d at 452. Thus, expert testimony is helpful in explaining to jurors why otherwise innocent behavior may be evidence of drug dealing. *See de Soto*, 885 F.2d at 360. Or how particular drug markets function. *See United States v. Brown*, 7 F.3d 648, 652 (7th Cir. 1993). Or the meaning of code words used to consummate sales. *See United States v. Hughes*, 970 F.2d 227, 236 (7th Cir. 1992).

But it is precisely because an expert provides much of the structure for the jury's understanding of the drug trade that courts must be mindful when the same witness provides both lay and expert testimony. The jury may unduly credit the witness's fact testimony given his status as an expert. *Brown*, 7 F.3d at 655. Experts famously possess an "aura of special reliability" surrounding their testimony. *Id.* And it is possible that the glow from this halo may extend to an expert witness's fact testimony as well, swaying the jury by virtue of his perceived expertise rather than the logical force of his testimony. *United States v. Doe*, 149 F.3d 634, 637 (7th Cir. 1998) ("This dual role may confuse the jury, which may not understand its own function in evaluating evidence."). Alternately, the jury may unduly credit the opinion testimony of an investigating officer based on a perception that the expert was privy to facts about the defendant not presented at trial. *See United States v. Brown*, 776 F.2d 397, 401 (2d Cir. 1985) (noting "risk [that] arises because the jury may infer that the agent's opinion

about the criminal nature of the defendant's activity is based on knowledge of the defendant beyond the evidence at trial"). Or the mixture of fact and expert testimony could, under some circumstances, come close to an expert commenting on the ultimate issue in a criminal matter. *See* FED. R. EVID. 704(b); *Brown*, 7 F.3d at 651, 653-54; *United States v. Boissoneault*, 926 F.2d 230, 233 (2d Cir. 1991).

But none of these forms of possible prejudice arose in Upton's case. Before Eversman's testimony, the district court gave a cautionary instruction explaining that Eversman would be serving both functions as a witness. *de Soto*, 885 F.2d at 361-62. Although it is a better route not to use an investigating officer as an expert witness in the first place, the government was careful to distinguish Eversman-the-expert from Eversman-the-lay-witness. There was a twenty-minute break between the two types of testimony. And although Upton points to several questions that were beyond Eversman's capacity as an expert, there is no indication that the government impermissibly mixed factual and expert testimony or that the government's mixed questioning was pervasive. In short, the sharp distinction between fact and expert testimony and the district court's cautionary instruction eliminated any risk of prejudice to the defendant. The district court was "well aware of its special responsibilities and proceeded with the utmost caution," *de Soto*, 885 F.2d at 362, and thus did not abuse its discretion in admitting Eversman's testimony.

## C. Denied Lesser-Included-Offense Instructions

Upton also argues on appeal that the district court erred in denying his request for lesser-included-offense instructions of simple possession. The amount of drugs actually seized following his arrest—4.4 grams of cocaine and 4.8

grams of crack—were not so large as to compel a finding of intent to distribute. The two sales to the confidential informant also involved only a small amount of crack. And Upton was a user, or so he admitted to the police following his arrest. This evidence, he argues, is consistent with a finding that he was a simple drug user who had no intention to distribute, justifying a simple possession instruction. We disagree.

This Court's review of a district court's denial of a lesser-included-offense instruction has both a legal and a factual component. The defendant must first establish that the requested instruction is for an offense necessarily included in the one charged. *United States v. McCullough*, 348 F.3d 620, 624 (7th Cir. 2003); *United States v. Boyles*, 57 F.3d 535, 544 (7th Cir. 1995) (holding that "necessary" means that the "elements of the lesser offense are a subset of the elements of the charged offense"). Then the defendant must show that a rational jury could have convicted him of the lesser offense, but not the greater. *Id.* The district court's answer to the first question is a legal one, which this Court reviews de novo; the answer to the second is based on the district court's estimate of the government's evidence, which we review for an abuse of discretion. *McCullough*, 348 F.3d at 624.

The district court properly denied both of Upton's requests for simple possession instructions. In the first place, simple possession of cocaine base is not a lesser-included offense for possessing a controlled substance with an intent to distribute. *United States v. Steward*, 252 F.3d 908, 909 (7th Cir. 2001); *United States v. Hill*, 196 F.3d 806, 808 (7th Cir. 1999). The government charged Upton with possessing a controlled substance (namely cocaine base) with intent to distribute under 21 U.S.C. § 841(a)(1), and Upton argued below for a simple possession instruction based on 21 U.S.C. § 844(a). As a general matter, the first sentence of § 844(a)—making it "unlawful

for any person knowingly or intentionally to possess a controlled substance"—does constitute a lesser-included offense for the crime of possession with intent to distribute under section 841(a)(1). *Hill*, 196 F.3d at 808. But simple possession of cocaine base falls within the third sentence of section 844(a), and this section requires the proof of an element—that the drug was crack—that section 841(a)(1) does not. *Id.* ("The requirement of that separate crime that the controlled substance be crack is not an element of the greater offense of possession with intent to distribute . . . a controlled substance."); *Steward*, 252 F.3d at 909 ("We have held that the third sentence creates a separate crime of possession of crack, which is not a lesser included offense of possession with intent to distribute a controlled substance."). Thus, Upton was not entitled to a simple possession instruction for the crack charge because it is not a lesser-included offense of possession with intent to distribute a controlled substance.

Nor was Upton entitled to a simple possession instruction for the cocaine count, albeit for a different reason. Unlike cocaine base, the simple possession of cocaine is a lesser-included offense to the possession of cocaine with intent to distribute. *See United States v. Puckett*, 405 F.3d 589, 600 (7th Cir. 2005). But the government put forth enough evidence so that no rational jury could have found him guilty of simple possession and not possession with intent to distribute. It is true, as Upton argues, that the amount of cocaine seized after his arrest was relatively small. *But see United States v. Hernandez*, 330 F.3d 964, 972 (7th Cir. 2003) (adopting Fourth Circuit's view that the "fact that a defendant possessed a small amount of cocaine 'is simply insufficient alone to require the lesser-included offense instruction.'" (quoting *United States v. Wright*, 131 F.3d 1111, 1112 (4th Cir. 1997))). And Eversman did testify at trial that Upton admitted to being a drug user. But in light of

the remaining evidence, it is simply not plausible that Upton possessed the cocaine solely for his personal use. *United States v. Chrismon*, 965 F.2d 1465, 1477 (7th Cir. 1992) ("[A] verdict on the lesser offense must be plausible as well as rational."). Most notably, he confessed to selling drugs from his house. In addition, there were two controlled buys involving small quantities of crack, one for 0.4 gram and another for 0.1 gram. Although this was crack, and not cocaine, the sales provide sufficient proof that Upton was not a simple user. And the smaller quantities indicate that Upton's sales involved modest amounts of drugs, cutting against the inference that the amount of cocaine was too small to profitably redistribute.

Further, the items seized from his home indicate Upton had set up a drug retail operation: marijuana, blue pills hidden in a cigarette box, another baggy of cocaine next to a digital scale for weighing out small drug quantities, white residue on the digital scale, small baggies used for distributing product to customers, a police scanner to guard against approaching law enforcement, weapons for self-help, prescription drugs that were not prescribed to him, and the list goes on. Expert testimony established that these were indicia of drug distribution. And a jury would have to blink all of this damaging evidence to conclude that Upton was just a user who blundered upon a police sting. Because a rational jury could not do so, the district court did not err in denying the lesser-included offense instructions.

### D.  Sentencing Enhancement

Finally, Upton argues that the district court erred in determining that Upton's prior convictions for possessing a sawed-off shotgun and domestic battery were "violent

felon[ies]" for purposes of the Armed Career Criminal Act.[1] The Armed Career Criminal Act requires a minimum sentence of fifteen years for a defendant who has "three previous convictions by any court . . . for a violent felony or a serious drug offense." 18 U.S.C. § 924(e)(1) (2006). A "violent felony" consists of "any crime punishable by imprisonment for a term exceeding one year" that

> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

> (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another;

18 U.S.C. § 924(e)(2)(B). The government offered the information or indictment for each of his convictions at sentencing. And the district court determined that they qualified as "violent felon[ies]," a decision we review de novo. *United States v. Golden*, 435 F.3d 612, 613 (7th Cir. 2006).

On appeal, Upton challenges the district court's conclusions with respect to two of the three prior convic-

---

[1] Upton also argues that the government should have included his prior convictions in the indictment and proven them to a jury beyond a reasonable doubt. As Upton recognizes, Supreme Court precedent forecloses this argument, *see United States v. Almendarez-Torres*, 523 U.S. 224 (1998), although doubts of its continued validity have been raised. *See Shepard v. United States*, 544 U.S. 13, 28 (2005) (Thomas, J. concurring) (reasoning that "a majority of the Court now recognizes that *Almendarez-Torres* was wrongly decided"); *see also United States v. Hendrix*, ___ F.3d ___, 2007 WL 4225274, *10 (7th Cir. 2007) ("*Almendarez-Torres* remains intact, notwithstanding subsequent decisions."). Regardless, we note the argument here in the event the law ever changes in Upton's favor.

tions.[2] First, he argues that the government did not prove that his Illinois conviction for unlawful possession of a sawed-off shotgun qualifies because the mere possession of a sawed-off shotgun does not pose a risk of serious physical injury. Illinois law provides that "[a] person commits the offense of unlawful use of weapons when he knowingly . . . possesses . . . a shotgun having one or more barrels less than 18 inches in length or any weapon made from a . . . shotgun . . . if such a weapon as modified has an overall length of less than 26 inches." 720 ILCS 5/24-1(a)(7)(ii) (2007). Illinois law punishes the crime as a Class 3 felony, calling for between two and five years' imprisonment (and meeting the federal definition of a felony). 730 ILCS 5/5-8-1(6) (2007).

This Court has already held that the possession of a sawed-off shotgun constitutes a crime of violence for purposes of enhanced punishment under the Sentencing Guidelines, *see United States v. Brazeau*, 237 F.3d 842, 844 (7th Cir. 2001), and the same conclusion obtains under the Armed Career Criminal Act. *See United States v. Rosas*, 410 F.3d 332, 335-36 (7th Cir. 2005). The relevant language in the Guidelines and the Act are identical: Both enhancements apply when an offense involves the "serious potential risk of physical injury to another." *Compare* U.S.S.G. § 4B1.2(a)(2) *with* 18 U.S.C. § 924(e)(2)(B)(ii). Because the text is identical, this Court's determination in *Brazeau*—that a sawed-off shotgun presents the "serious potential risk of physical injury" under the Guidelines— forecloses Upton's argument. *Rosas*, 410 F.3d at 336. Nor can one deny that a sawed-off shotgun poses such a risk. People do not shorten their shotguns to hunt or shoot skeet. Instead, the shortened barrel makes the

---

[2] Upton has not questioned that aggravated battery is a "violent felony."

guns easier to conceal and increases the spread of the shot when firing at close range—facts that spurred Congress to require the registration of all sawed-off shotguns, along with other dangerous weapons like bazookas, mortars, pipe bombs, and machine guns. *Brazeau*, 237 F.3d at 845. Accordingly, the district court did not err in concluding that Upton's conviction constituted a "violent felony."

Upton also argues that his convictions for domestic battery do not qualify. Under Illinois law, a "person commits domestic battery if he intentionally or knowingly without legal justification by any means . . . [c]auses bodily harm to any family or household member." 720 ILCS 5/12-3.2(a)(1). An offender's first domestic-battery conviction is a misdemeanor. But "if the defendant has any prior conviction . . . for domestic battery," it becomes a Class 4 felony, punishable by between one and three years' imprisonment. 720 ILCS 5/12-3.2(b); *see also* 730 ILCS 5/5-8-1. Upton has an unfortunate number of convictions for domestic battery (though one is too many), and he spent time in prison for three of them.

These convictions clearly qualify under the Act. In light of his recidivism, Upton's convictions were Class 4 felonies, which allow for one to three years' imprisonment. 730 ILCS 5/5-8-1(7). For all three convictions, Illinois charged Upton with committing domestic battery under 720 ILCS 5/12-3.2(a)(1). This provision of the statute unambiguously requires proving "physical force": to sustain his conviction for domestic battery, the state had to prove that he "[c]ause[d] bodily harm," which means that it had as an element "the use . . . of physical force against the person of another." *See United States v. Townsend*, 419 F.3d 663, 664 (7th Cir. 2005) ("When there is no ambiguity in the charging documents or in the statutory definition of the crime, it is not necessary to undertake a factual review."). Thus, the district court did

not err in concluding that Upton's domestic-battery convictions were "violent felon[ies]."

## III.  Conclusion

In light of the forgoing, we AFFIRM Upton's convictions and sentence.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*