In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1182

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DWAYNE GARRETT,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 08 CR 401 — **James B. Zagel**, *Judge.*

ARGUED SEPTEMBER 17, 2013 — DECIDED JUNE 26, 2014

Before WILLIAMS, SYKES, and TINDER, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Dwayne Garrett was found guilty of possessing with intent to distribute 50 or more grams of crack cocaine and sentenced to 190 months in prison. He appeals both his conviction and sentence.

We reject Garrett's argument that the district court erred in denying his motion to suppress alleged post-arrest statements and information recovered from the search of his cell phone. He claims that the post-arrest statements were inadmissible, but phone calls intercepted by law enforcement officials, eyewitness testimony, and the recovery of a large amount of money and drugs establish that officers had

probable cause to arrest him. Garrett also contends that law enforcement officials did not have his consent to search the contents of his phone, but the district court reasonably found that Garrett consented to the phone search and properly denied his motion to suppress.

Garrett's argument that it was error to allow the investigating agent to testify as an expert in the drug trade also fails because the judge did not permit the parties to refer to the officer as an expert before the jury. In addition, he cannot prevail on his assertion that the court erred by instructing the jury not to consider Garrett's potential punishment because the court did not misstate the law or mislead the jury in understanding its role. Similarly, his attack on the jury's special verdict form also fails because the use of the outdated form did not prejudice him since he received the benefit of the Fair Sentencing Act's reduced penalties at sentencing.

However, we do agree with Garrett's argument that the district court erred in calculating the appropriate Guidelines range for Garrett's drug offense because the court did not clearly state the drug quantity that it found attributable to Garrett or adequately indicate the evidence it found reliable in determining his relevant conduct.

For these reasons, we affirm Garrett's conviction, but vacate his sentence and remand for resentencing.

## I. BACKGROUND

As part of a drug investigation that began in April 2007, federal law enforcement officials from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") tracked the drug activities of Isaiah Hicks. These activities led them to the defendant, Dwayne Garrett, who, during an intercepted phone call on March 2, 2008, ordered a "nine," meaning nine ounces of crack cocaine, that was "all the way dry." Based on this conversation, the agents expected the exchange to occur the following day. ATF agents also received a tip that a drug

transaction involving a purple Chrysler Concorde was going to take place in the parking lot of a pizza restaurant on Chicago's South Side.

The next day, in addition to continuing to intercept phone calls between Garrett and Hicks, ATF agents and officers from the Cook County Sheriff's Police Department ("CCSPD") staked out the pizza place and surrounding area. Garrett made another call to Hicks to confirm that he was on his way to "the restaurant" and "ready for him." Garrett pulled into the parking lot of the pizza place with his co-defendant, Patrick Jones, in Garrett's purple Chrysler Concorde. After a detour and another call to Hicks, Garrett and Jones returned to the parking lot where ATF Special Agent Jeffrey Sisto saw another man enter the backseat of the car, hand a plastic bag to Garrett and Jones, and leave. About one minute later, Hicks called Garrett to ask if he was pleased with the drugs and Garrett indicated that he was.

Garrett drove away from the restaurant, eventually pulled over, and let Jones out. At that point, two CCSPD officers, who had been following Garrett, approached his car, searched him, and found about $1,100 in cash and a cell phone. They also found another phone in the car's console. Meanwhile, ATF Special Agents Hamilton Beal and Lee Casa followed Jones, donning gear marked "police." Agent Beal testified that once Jones realized agents were pursuing him, Jones ran down an alley and threw several plastic baggies containing a white substance into the backyard of a house. After catching Jones, the agents recovered three plastic bags of crack cocaine from the backyard of that house and arrested both Jones and Garrett. According to Agent Beal, he advised Garrett of his *Miranda* rights en route to the Maywood Sheriff's Office. Agent Labno indicated that he interviewed Garrett within two hours of his arrest as well as the following day, March 4.

Garrett was indicted, along with more than two dozen co-defendants, and charged with possession with intent to distribute 50 or more grams of crack cocaine and using a cell phone in furtherance of that crime. In pre-trial proceedings, the district court found that there was probable cause to arrest Garrett and denied Garrett's motion to suppress his post-arrest statements made to law enforcement officials on March 3. So at trial, Agent Labno testified that Garrett waived his *Miranda* rights and admitted that earlier that day Hicks sold him nine ounces of cocaine packaged in four plastic bags. Agent Beal testified that, based on that information, he went back to the house where Jones had tossed the baggies and found a fourth plastic bag containing cocaine. The four baggies contained a total of 241 grams of crack cocaine. Agent Labno also testified that Garrett consented to a search of his cell phone, which contained Hicks's phone number. Although Garrett claimed he did not give consent, the court had previously credited Agent Labno's version of the events, and the government offered this evidence at trial in support of its argument that Garrett used a cell phone to buy drugs from Hicks.

In addition to his lay testimony, the government also sought to have Agent Labno testify as an expert in the field of narcotics. Garrett moved to exclude the expert testimony, but the court denied the motion, finding "nothing about the nature of [Agent Labno's] specific testimony in this case that constitutes opinion evidence that is going to have any bearing on his fact testimony." The court did, however, caution the parties not to refer to Agent Labno as an expert in the presence of the jury, and they complied, only referring to his expert testimony as "opinion" testimony. The judge also referred to Agent Labno's expert testimony as opinion testimony in his instructions to the jury. As a result, Agent Labno was never called an expert in the jury's presence. During the expert portion of his testimony, Agent Labno discussed

general terminology and common practices in the crack cocaine drug trade.

At the close of trial, the court instructed the jury not to consider or discuss the sentence that might result from their verdict. The district judge reiterated that, while it was the jury's job to determine whether Garrett was guilty, the question of punishment should be left for his consideration alone. The judge warned the jury not to speculate about the punishment or allow it to enter into its considerations or discussions at any time.

The jury was given a special verdict form with instructions to determine, in addition to the question of guilt, whether Garrett possessed with the intent to distribute a measurable amount but less than five grams, at least five grams but less than fifty grams, or fifty or more grams of crack cocaine. Having heard evidence of the 241 grams of crack cocaine the agents recovered on March 3, the jury selected the box indicating that it found Garrett possessed and intended to distribute 50 or more grams of crack cocaine. In addition to returning a guilty verdict on the possession charge, the jury found Garrett guilty of using a cell phone to facilitate the drug deal.

The details of Garrett's alleged March 4 interview with Agent Labno became relevant at the time of sentencing. The government indicated that Garrett fully cooperated with law enforcement officials during this second interview and, in addition to giving consent to search his cell phone, added more details to the confession he made the day before. Specifically, Agent Labno stated that Garrett admitted that between the summer of 2007 and March 3, 2008 he bought at least two kilograms of cocaine from Hicks and sold the drugs to Jones. The district court credited Agent Labno's testimony and, although the government did not seek to admit this evidence at trial, Garrett's extended drug relationship

with Hicks became an important factor in determining the drug quantity attributable to Garrett's offense.

For the conviction of possession with intent to distribute crack cocaine, the Presentence Investigation Report ("PSR") calculated Garrett's base offense level at 34 because "the amount of cocaine base [Garrett was] known to have obtained and possessed for distribution was at least 840 grams, but less than 2.8 kilograms." This conclusion rested solely on Agent Labno's statement, contested by Garrett, that Garrett confessed to purchasing at least two kilograms of crack cocaine from Hicks over the course of their year-long buyer-seller relationship. The PSR also recommended a two-point enhancement for obstruction of justice based on its finding that Garrett gave false testimony regarding his post-arrest statements during his suppression hearing. With an adjusted offense level of 36 and a criminal history category of V, the PSR calculated the advisory Guidelines range as 292-365 months' imprisonment. The court agreed that the appropriate offense level was 36, but sentenced Garrett under the Guidelines range appropriate for an offense level of 33 after reducing Garrett's offense level by two levels because of "a certain uncertainty as to the quantity in this case" and one level from the obstruction of justice enhancement because of its insignificance within the context of the case. But the court did not state the exact drug quantity for which it was finding Garrett responsible. Finally, the court reduced his criminal history category to Category III, finding that some of Garrett's previous offenses were unrelated to the instant offense. Based on these findings, the court calculated the appropriate Guidelines range as 168-210 months and sentenced Garrett to 190 months' imprisonment on the possession conviction. Garrett now appeals his conviction and sentence.

## II. ANALYSIS

Garrett argues that the district court committed various errors during the course of his trial and sentencing. He asks

us to find that the district court erred in denying his motion to suppress his post-arrest statements and information recovered from his cell phone, allowing Agent Labno to testify as an expert in the drug trade, instructing the jury not to consider his potential sentence in determining guilt, and in determining the appropriate sentence for his conviction. We take each of these arguments in turn.

### A. No Error in Denying Motion to Suppress Post-Arrest Statements and Cell Phone Content

It is Garrett's position that the statements he made to law enforcement officials on March 3 and March 4 should not have been admitted at trial. Garrett argues that the March 4 statements were inadmissible because they were made more than six hours after his arrest but before he was presented to a magistrate judge. *See* Fed. R. Crim. Pro. 5(a)(1) (requiring a defendant to be taken before the appropriate judicial officer "without unnecessary delay"); *Corley v. United States*, 556 U.S. 303, 322 (2009) (holding that courts must decide whether the delay beyond six hours was reasonable before admitting any confession made after that period). But we need not decide whether Garrett's March 4 statements were admissible, since the government did not offer those statements at trial.[1]

Garrett argues that the March 3 statements were inadmissible because, when the agents arrested him, they lacked probable cause to believe that he was involved in criminal activity. Here, we review the district court's legal conclusions de novo and its findings of fact for clear error. *United States v. Breland*, 356 F.3d 787, 791 (7th Cir. 2004). We will not disturb the district court's factual findings unless we are

---

[1] We note in passing that Garrett's March 3 statements were made within six hours of his arrest, so the failure to present him to a magistrate is not a basis to exclude those statements. 18 U.S.C. § 3501(c); *see Corley*, 556 U.S. at 322.

"left with a definite and firm conviction that a mistake has been made." *United States v. Bass*, 325 F.3d 847, 850 (7th Cir. 2003) (quoting *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994)).

Garrett is correct that the officers were required to have probable cause, or a reasonable belief, "in light of the facts and circumstances within their knowledge at the time of the arrest, that the suspect had committed or was committing an offense." *United States v. Biggs*, 491 F.3d 616, 620 (7th Cir. 2007). Absent probable cause, the arrest would not have been warranted, and any resulting statements or evidence would most likely be the proper subject of a motion to suppress. *See United States v. Fields*, 371 F.3d 910, 914 (7th Cir. 2004).

But we do not agree that the district court erred in finding that probable cause was established by the facts in this case. At the evidentiary hearing, law enforcement officials testified regarding their involvement in the wiretap operation and their observance of Garrett's illicit activities. The joint efforts of ATF and CCSPD resulted in the interception of several phone calls between Hicks and Garrett suggesting a drug transaction was underway and a tip that a drug transaction involving Garrett's purple Chrysler Concorde would occur at a particular pizza restaurant on March 3. On March 3, the officers witnessed Garrett and Jones, in Garrett's purple Concorde, receive a plastic bag from a man who entered and exited the car in the pizza place's parking lot. This transaction occurred minutes after Garrett told Hicks he was "ready for him," and was immediately followed by a phone call by Hicks to ensure that Garrett was satisfied with the drugs. Surely this was sufficient to raise at least a reasonable suspicion—if not probable cause—that crime was afoot, which was all that was necessary for the officers to stop Garrett to investigate. *See United States v. Johnson*, 383 F.3d 538, 543 (7th Cir. 2004). The discovery of $1,100 in cash

on Garrett's person provided further support for probable cause to arrest. But any remaining doubt as to probable cause was dispelled once Jones, right after leaving Garrett's car, decided to run from the officers and toss several plastic bags with white substances over a fence. The officers did not arrest Garrett until they recovered these plastic bags and saw that they contained a hard, white substance that looked like, and was later determined to be, crack cocaine. The initial stop and arrest were lawful, and Garrett was not entitled to suppress his March 3 post-arrest statements.

Garrett's claim that the search of his cell phone was unconstitutional fares no better. Both Agent Labno and Garrett testified to the events that occurred on March 4 at the suppression hearing. Garrett denied consenting to Agent Labno's search of his phone, but Agent Labno testified that he did give consent. Although Agent Labno did not state in his formal written report that Garrett consented or include any discussions he had with Garrett regarding his phone, he presented his notes to the court, which contained various individuals' names and phone numbers. The court found that Agent Labno's notes "boosted his credibility" and, after hearing all of the evidence, concluded that Agent Labno's testimony was "far more credible" than Garrett's.

We generally defer to the district court's credibility determinations at suppression hearings because we recognize that, "unlike our review of transcripts, the district court had the opportunity to listen to testimony and observe the demeanor of witnesses." *Biggs*, 491 F.3d at 621. But this deference will not insulate the ruling if the district court "credited exceedingly improbable testimony." *Bass*, 325 F.3d at 850. This is admittedly a very demanding burden. *See Biggs*, 491 F.3d at 621 (holding that "determinations of witness credibility can virtually never be clear error").

Agent Labno's testimony did not paint an exceedingly improbable story. There is nothing uncommon about a sus-

pect offering information implicating other individuals in criminal activity in the hopes that his cooperation with law enforcement officials will result in a more favorable prosecution for him. Agent Labno testified that Garrett consented to a search of his phone as an act of cooperation. Garrett's testimony that he was not cooperating does not transform Agent Labno's reasonable account into an improbable one. It simply forced the district court to decide which party's testimony to credit. Since Agent Labno's version of events was not improbable, the district court did not clearly err in crediting Agent Labno's testimony over Garrett's and we leave the district court's findings undisturbed.

### B. No Error in Allowing Agent Labno to Testify as Fact and Opinion Witness

Garrett next argues that the district court should not have admitted expert testimony from Agent Labno at trial because it was irrelevant and improperly bolstered the government's case. Our review of the district court's decision to admit expert testimony is for abuse of discretion. *United States v. Upton*, 512 F.3d 394, 401 (7th Cir. 2008).

Garrett's objection to the testimony on relevance grounds is without merit. We have consistently upheld prosecutors' practice of calling expert witnesses to discuss common practices of the drug trade in cases of drug dealing. *See, e.g., United States v. Morris*, 576 F.3d 661, 673–74 (7th Cir. 2009); *Upton*, 512 F.3d at 401 (discussing various cases related to the drug trade). During his expert testimony, Agent Labno described the characteristics of crack cocaine, the quantities of drugs that dealers typically possess for purposes of distribution, common prices for wholesale quantities of crack cocaine, and the meaning of certain industry code words. The topics he discussed were relevant to points at issue in Garrett's trial. In a case, like this one, where the government was attempting to prove that the intercepted calls between Garrett and Hicks concerned the coordination of a drug deal,

deciphering code words commonly used in the drug trade would undoubtedly "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Information on the quantities, prices, and characteristics of crack cocaine served the same purpose. Understanding the drug's characteristics would help the jury determine whether the substances presented at trial as belonging to Garrett were indeed illegal drugs, while testimony regarding the drug's wholesale quantities and prices would assist the jury in deciding whether Garrett's activities involved the distribution of drugs or simply drug possession.

Whether Agent Labno was the proper person to offer this expert testimony is a separate question. As we have said, "Testimony runs the risk of being overly prejudicial when, as here, the expert witness was a law enforcement officer who was also involved in the investigation at issue." *Morris*, 576 F.3d at 675. Our concern is that "the jury may attach undue weight to the officer's testimony," *United States v. Lipscomb*, 14 F.3d 1236, 1242 (7th Cir. 1994), and "unduly credit the witness's fact testimony given his status as an expert," *Upton*, 512 F.3d at 401 (overruled in part on other, unrelated grounds). The heightened reliability that jurors often attach to expert testimony could easily lead a juror to believe that the officer's fact testimony must be reliable as well, and thereby elevate that testimony to a level of credibility that it would not otherwise enjoy. Avoiding that danger is precisely why "it is a better route not to use an investigating officer as an expert in the first place." *Id.*

While we caution against this practice, the district court did not abuse its discretion in allowing the testimony in this case. We find most persuasive the fact that the court never referred to Agent Labno as an expert in the jury's presence and did not allow the parties to so refer to him. And the parties only used the term "opinion testimony" in referring to his experience and testimony regarding terminology and

practices of the drug trade. The judge also used the term
"opinion" testimony in each instance that he referred to
Agent Labno's "expert" testimony before the jury. After the
proper foundation had been laid for his "expert" testimony,
the judge told the jury:

> [Agent Labno] has already testified as a fact witness,
> he is now going to offer opinion evidence …, and I
> have permitted him, based on what you've just heard,
> to offer such opinion evidence. I will instruct you lat-
> er on the way you consider opinion testimony, in
> general.

And later, at the close of trial, he gave this instruction:

> You have heard witnesses give opinions about mat-
> ters requiring special knowledge or skill. You should
> judge their testimony in the same way that you judge
> the testimony of any other witness. The fact that such
> a person has given an opinion does not mean you are
> required to accept it.

Clearly, Agent Labno was not referred to as an expert be-
fore the jury. Avoiding the use of the term "expert" goes a
long way in reducing the possibility that jurors will attach
"undue weight" to the testifying officer's fact testimony and
substantially reduces any potential prejudice a defendant
may suffer from admitting fact and expert testimony from
the same officer. *See United States v. Cheek*, 740 F.3d 440, 447–
50 (7th Cir. 2014) (finding no error in admitting dual testi-
mony where the government "did not explicitly present [the
officer] to the jury as an expert").

The court also took several other precautions to help the
jury distinguish between the two types of testimony. The
judge did not allow the government to lay the foundation for
Agent Labno's expert, or opinion, testimony until after his
fact testimony was concluded. Moreover, the fact testimony
and expert testimony were, for the most part, completely

separate. The government specified when the fact portion of Agent Labno's testimony had concluded, and generally steered clear of questions of fact during his expert testimony. *See Upton*, 512 F.3d at 400–402 (finding no abuse of discretion where a few questions were posed during the officer's expert testimony regarding his factual knowledge of the case). The government's questions regarding the meaning of code words Garrett used during his phone calls with Hicks were properly asked during his opinion testimony, since Agent Labno's understanding of these words was based on his experience in the field and not solely on his personal knowledge of the case itself. *See Cheek*, 740 F.3d at 447–48 (explaining that where knowledge about the meaning of drug code words is based on experience and expertise working in other drug cases it is expert testimony).

In addition, the court highlighted the distinction between the fact testimony and opinion testimony in its instructions to the jury:

> You have heard the testimony of ATF Special Agent Chris Labno, who testified to both facts and opinions. Each of these types of testimony should be given the proper weight.

> As to the testimony to facts, consider the factors discussed earlier in these instructions … As to the testimony on opinions, you do not have to accept Agent Labno's opinion. In deciding how much weight to give it, you should consider the witness's qualifications and how he reached his conclusions along with the other factors discussed in these instructions for weighing the credibility of witnesses.

Even though it is still possible that the in-depth foundational questions required to qualify Agent Labno could increase, in a juror's mind, the reliability of his entire testimony, we find that the many precautions the district court took to avoid the

potential pitfalls associated with dual testimony sufficiently decreased any prejudice to Garrett in this case. *See Upton*, 512 F.3d at 401–02; *United States v. Mansoori*, 304 F.3d 635, 654 (7th Cir. 2002); *Lipscomb*, 14 F.3d at 1242 (recognizing that the potential for undue prejudice "can be minimized by cautionary instructions and by carefully constructed examination"). Therefore, the court did not abuse its discretion by allowing Agent Labno to testify as both a fact and expert witness.

## C. No Error in Jury Instructions regarding its Duty or in Special Verdict Form

Garrett next focuses on the court's jury instructions, arguing that the instruction not to speculate on the punishment that would result from a guilty verdict was misleading. While we conduct de novo review of questions of law underlying the district court's jury instructions, "the district court is afforded substantial discretion with respect to the precise wording of instructions so long as the final result, read as a whole, completely and correctly states the law." *United States v. DiSantis*, 565 F.3d 354, 359 (7th Cir. 2009) (citations omitted). So we will only reverse if the instructions mislead the jury by failing to correctly and sufficiently inform the jury of the applicable law and of its duty to determine the issues presented in the case. *See United States v. Javell*, 695 F.3d 707, 714 (7th Cir. 2012) (citations and quotations omitted); *DiSantis*, 565 F.3d at 359 (citing *United States v. Madoch*, 149 F.3d 596, 599 (7th Cir. 1998)).

Here, the court instructed the jury as follows:

If you find the defendant guilty, it will then be my duty to decide what punishment should be imposed. In considering the evidence and arguments that have been given during the trial, you should not guess or speculate about the punishment. It should not enter into your consideration or discussions at any time.

Garrett argues that this instruction was misleading because the jury was, in fact, being asked to determine drug quantities, and its determinations could trigger a mandatory minimum punishment. His argument is without merit. We read the court's instruction as informing the jury to focus on questions of guilt and leave the matter of punishment for the judge to determine. This instruction aligns with the principle that determining the appropriate sentence upon conviction is fully within the province of the judge, not the jury, a principle supported by our case law. "Juries are not to consider the consequences of their verdicts." *United States v. Diekhoff*, 535 F.3d 611, 621 (7th Cir. 2008) (citing *Shannon v. United States*, 512 U.S. 573, 579 (1994)). Indeed, "[t]he jury's finding of facts and application of those facts to the law just do not require it to ponder what the ultimate sentence will be." *Id.*

Nor does Garrett suggest, in his bare bones argument, that the government made any statement before the jury that misrepresented the consequences of returning a guilty verdict. Therefore, the exception to the general rule that the sentence does not concern the jury does not apply here. *See id.* (noting an exception to the general rule "where there is a danger that the jury has been misled regarding the consequences of its verdict"). So we find no error in the district court's instructions, and decline Garrett's invitation to reverse.

We also find no support for Garrett's argument that the district court erred in giving the jury a special verdict form with outdated drug quantities because the error did not result in any prejudice against Garrett. Garrett's offense occurred at a time when conviction for possession with the intent to distribute between five and 50 grams of crack cocaine carried a mandatory minimum sentence of five years' imprisonment and 50 or more grams of crack cocaine required ten years' imprisonment. *See* 21 U.S.C. §§ 841(b)(1)(A)(iii), (b)(1)(B)(iii) (2006 ed.). But the Fair Sentencing Act of 2010

("FSA" or "Act") increased the threshold amounts of cocaine base required to trigger statutory minimum penalties to 28 grams for five years' imprisonment and 280 grams for ten years' imprisonment. *See* 21 U.S.C. §§ 841(b)(1)(A)(iii), (b)(1)(B)(iii) (2010). At the time of Garrett's conviction, courts of appeals were divided on whether the FSA's more lenient penalties applied to defendants whose conduct occurred before the Act's passage but who were sentenced after its enactment. The Supreme Court clarified in *Dorsey v. United States*, 132 S. Ct. 2321, 2331 (2012), that the FSA applied to all offenders sentenced after its effective date, even if their conduct preceded the Act.

The district court did not have the benefit of *Dorsey* when it rejected Garrett's special verdict form that proposed replacing the drug quantities that previously triggered mandatory minimums (5 and 50 grams) with the FSA's amended minimums (28 and 280 grams). Hindsight tells us that Garrett was right to propose a verdict form that reflected the drug quantities applicable under the FSA, but he did not suffer any harm from the error. At sentencing, the court agreed that the mandatory minimum was five years based on the jury's finding that Garrett was guilty of possessing with the intent to distribute 50 grams or more of crack cocaine. Since only 28 grams are required to trigger that five year minimum under the FSA, and the jury found him guilty of at least 50 grams, Garrett received the benefit of the FSA's more lenient penalty provisions and was not prejudiced by the outdated special verdict form.

### D. Sentencing Error in Not Making Explicit Drug Quantity Finding

We come to a different conclusion regarding the district court's process for calculating Garrett's advisory Guidelines sentence. Garrett asserts that the district court erred in holding him responsible for at least 840 grams but less than 2.8 kilograms of cocaine base without first making a drug quan-

tity finding. We conduct clear error review of the district court's factual findings regarding the drug quantity involved in Garrett's offense. *United States v. Krasinski*, 545 F.3d 546, 551 (7th Cir. 2008).

As part of *Gall*'s two-step process, the trial court must first correctly calculate the defendant's Guidelines range. *Gall v. United States*, 552 U.S. 38, 49 (2007). An essential part of that calculation is determining the offender's base offense level. *United States v. Claybrooks*, 729 F.3d 699, 706 (7th Cir. 2013). Since for drug crimes, "a defendant's base offense level is largely a function of the amount of drugs involved in his offense," sentencing courts are required to explicitly state their drug-quantity findings in arriving at the appropriate sentence. *Id.* Otherwise, the reviewing court is left without any basis to determine whether the sentencing court properly executed its duty under the first prong of *Gall*'s two-pronged mandate.

Our review is stymied because the court did not make a clear finding as to the quantity of drugs it found attributable to Garrett. It is undisputed that the evidence at trial concerned approximately 241 grams of cocaine. Adopting this quantity would have resulted in a base offense level of 30. But the sentencing court can increase a defendant's sentence based on other relevant conduct not proven at trial, such as the amount of drugs attributable to defendant, so long as that conduct is proven by a preponderance of the evidence. *See United States v. Johnson*, 342 F.3d 731, 734 (7th Cir. 2003). The court is not limited by the rules of evidence at sentencing, but the evidence considered in determining the drug quantity attributable to the defendant must carry indicia of reliability. *United States v. Westmoreland*, 240 F.3d 618, 630 (7th Cir. 2001). The PSR, relying on Agent Labno's statement that Garrett admitted to purchasing at least two kilograms of cocaine from Hicks, concluded that Garrett was responsible for at least 840 grams but less than 2.8 kilograms, resulting in

a base offense level of 34. The PSR then applied a two-level enhancement for obstruction of justice for a final offense level of 36. The court, at sentencing, stated its belief that 36 was the appropriate offense level. But it never gave any indication of the drug quantity for which it found Garrett personally responsible.

Had the district court indicated that it found the PSR reliable, stated why, and adopted the PSR's finding that Garrett distributed at least two kilograms of crack cocaine, we would have a different record before us. "We have long held that a district court may rely on factual information contained in a PSR so long as it bears sufficient indicia of reliability." *United States v. Davis*, 682 F.3d 596, 613 (7th Cir. 2012). The court would have been within its discretion to conclude that the PSR's findings, based on Agent Labno's testimony that Garrett admitted possessing two kilograms of cocaine, were more reliable than Garrett's unsupported word that he did not. Garrett's denial alone would not necessarily render the PSR's factual finding unreliable. *See id.* (finding that a defendant's mere denial must be supported by some evidence to cast doubt on the PSR's reliability). It would only require the court to make a credibility determination. *United States v. Contreras*, 249 F.3d 595, 602 (7th Cir. 2001) (affirming the finding that the law enforcement officer's statement was reliable even in the absence of corroborating evidence and in the face of defendant's denial).

At first glance, it appears that the district court did just that by stating its belief that "the offense level is properly calculated at 36." Sen. Tr. 16. But the court never specified the drug quantity it used to arrive at that conclusion or stated that it was adopting the PSR's findings. To the contrary, the judge expressed concern that the appropriate drug quantity was unclear. Highlighting the lack of "specifics of the admissions or its context" in Agent Labno's report, the judge found "a certain uncertainty as to the quantity in this case."

*Id.* at 41. We cannot conclude that the court adopted the PSR's factual findings when it cast such doubt on the reliability of the evidence the PSR used. *See Claybrooks*, 729 F.3d at 707 (declining the invitation to find the district court adopted the PSR when the district court questioned the reliability of the information on which the PSR relied).

It is true that a sentencing court may, based on the preponderance of the evidence, reasonably estimate the drug quantity that applies to a defendant's offense. *Krasinski*, 545 F.3d at 551–52. But this does not mean that the court should leave the drug quantity undetermined. *United States v. Palmer*, 248 F.3d 569, 571 (7th Cir. 2001). Instead, the court must explicitly state its drug quantity finding, *id.*, and provide "some description of the reliable evidence used to support the finding and the method used to calculate it," *Claybrooks*, 729 F.3d at 707.

The district court erred because it neither explicitly stated the drug quantity it found attributable to Garrett nor provided any indication of the evidence it found reliable. If the court did not find Agent Labno's testimony reliable, the government would have been left with a base offense level of 30 instead of 34. Using the same criminal history category of III that the district court used but not accounting for the application of the obstruction of justice enhancement (which may have been affected by the district court's drug quantity finding), this change alone would have been the difference between a Guidelines range of 188-235 months versus one of 121-151 months' imprisonment. The government gives us no reason to believe that the district court would have given Garrett the same 190-month sentence if it had made a drug quantity finding, and we do not find the court's error to be harmless. *See United States v. Abbas*, 560 F.3d 660, 667 (7th Cir. 2009) (finding that proving harmless error requires the government to show "that the Guidelines error did not affect the district court's selection of the sentence imposed").

Therefore, we vacate Garrett's sentence and remand the case for resentencing.

Garrett correctly asserts that the Supreme Court's decision in *Alleyne v. United States* means that, irrespective of the drug quantity the court finds attributable to Garrett on remand, the mandatory minimum sentence applicable to his conviction must be based on the jury's finding. *See* 133 S. Ct. 2151, 2163 (2013) (demanding that any fact, other than a prior conviction, that increases the mandatory minimum punishment for an offense must be submitted to a jury); *Claybrooks*, 729 F.3d at 708. After *Alleyne*, the sentencing court is no longer in a position to increase the mandatory minimum applicable to Garrett through its own drug quantity findings. *See Claybrooks*, 729 F.3d at 708 ("The district judge cannot raise the mandatory sentencing floor based on its own determination that [defendant's] offense involved additional amounts of narcotics beyond those determined by the jury."). The jury found that Garrett's offense involved at least 50 grams of crack cocaine, which normally triggers a mandatory minimum sentence of five years' imprisonment. *See* 21 U.S.C. § 841(b)(1)(B)(iii) (2010). So even if the court finds that Garrett was responsible for at least two kilograms of crack cocaine (which corresponds with a mandatory minimum sentence of ten years, *see* 21 U.S.C. § 841(b)(1)(A)(iii)), this finding could have no effect on Garrett's mandatory minimum sentence. *See United States v. Hernandez*, 731 F.3d 666, 672 (7th Cir. 2013) (affirming district court's drug quantity finding because it was not used to increase defendant's statutory mandatory minimum); *see also Claybrooks*, 729 F.3d at 708.

But that will not limit the court's sentencing hand as much as Garrett hopes. *Alleyne* does not require the fact of a prior conviction to be found by a jury. 133 S. Ct. at 2160 n. 1; *see United States v. Boyce*, 742 F.3d 792, 799 (7th Cir. 2014). So while *Alleyne*'s holding shields defendants from being sub-

ject to heightened mandatory minimum sentences based on a judge's drug quantity finding, it does nothing to protect defendants from an increased mandatory minimum sentence based on a prior conviction. The statutorily required minimum penalty mandated by section 841(b)(1)(B) increases to ten years' imprisonment for defendants previously convicted of a felony drug offense, *id.*, and Garrett was convicted of a felony drug offense in 1993. He tries to challenge the use of this conviction as a basis for increasing his mandatory minimum under section 841(b)(1)(B) by contesting its validity, but section 851 bars his attempted collateral attack. *See* 21 U.S.C. § 851(e) ("No person who stands convicted of an offense under this part may challenge the validity of any prior conviction alleged under this section which occurred more than five years before the date of the information alleging such prior conviction."). Despite his arguments to the contrary, Garrett's 1993 conviction qualifies as a proper basis to increase his mandatory minimum sentence to ten years' imprisonment. *See* § 841(b)(1)(B)(iii).

Garrett is also incorrect if he thinks *Alleyne* will necessarily save him from receiving the same, or even a higher, sentence upon remand. Though it can have no impact on his mandatory minimum or maximum sentence, the court's drug quantity finding becomes relevant in helping the court determine Garrett's Guidelines sentence. *See Alleyne*, 133 S. Ct. at 2163 (reiterating that trial courts' "broad sentencing discretion" can continue to be "informed by judicial factfinding" without conflicting with the Sixth Amendment); *id.* ("Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury"); *United States v. Valdez*, 739 F.3d 1052, 1054 (7th Cir. 2014) (finding that district court's calculation of "a greater drug quantity solely for purposes of determining [defendant's] Guideline range" did not run afoul of *Alleyne*). *Alleyne*, and its predecessor *Apprendi v. New Jersey*, only limit the judge's discre-

tion to the extent that he may not sentence a defendant below the mandatory minimum or beyond the mandatory maximum established based on the jury's findings, which in this case, given Garrett's prior felony drug conviction, is life imprisonment. *See* § 841(b)(1)(B)(iii); *see generally* 133 S. Ct. 2151; 530 U.S. 466 (2000).

Since we find that the district court did not first adequately calculate the appropriate Guidelines range, we do not reach *Gall*'s second step. Our inquiry ends here because the correct Guidelines sentence "provides the launching point for our review under *Gall*'s [second,] substantive reasonableness prong." *Abbas*, 560 F.3d at 667. However, we acknowledge the district court's broad discretion to determine a reasonable sentence that may deviate from the appropriately determined advisory Guidelines range upon consideration of the § 3553(a) factors. *Spears v. United States*, 555 U.S. 261, 264–65 (2009); *United States v. Booker*, 543 U.S. 220, 245–46 (2005); *United States v. Prado*, 743 F.3d 248 (7th Cir. 2014). The judge's consideration of these factors may result in a downward or upward deviation from the Guidelines sentence and nothing in our opinion is intended to suggest that the district court may not settle on the same sentence upon review. But this discretion only kicks in once the appropriate Guidelines range has been determined. *See United States v. Boroczk*, 705 F.3d 616, 622 (7th Cir. 2013); *United States v. Avila*, 465 F.3d 796, 798–99 (7th Cir. 2006) (recognizing that the judge may come to the same sentencing conclusion after considering various factors, but remanding for the court to first determine the correct Guidelines range before choosing a reasonable sentence).

### III. CONCLUSION

We AFFIRM Garrett's conviction but VACATE his sentence and REMAND for resentencing consistent with this opinion.