In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-3473

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL L. BROCK,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 10 CR 11—**Larry J. McKinney**, *Judge.*

ARGUED APRIL 9, 2012—DECIDED JULY 30, 2013

Before FLAUM and HAMILTON, *Circuit Judges*, and
FEINERMAN, *District Judge.*[*]

HAMILTON, *Circuit Judge.* Defendant-appellant Michael
Brock was convicted in a jury trial on three counts of
possessing a firearm as a convicted felon. See 18 U.S.C.
§ 922(g)(1). He was sentenced to a fifteen-year manda-

[*] The Honorable Gary Feinerman of the Northern District
of Illinois, sitting by designation.

tory minimum term of imprisonment under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(1). In this appeal, he challenges his convictions and his sentence. The challenge to the convictions is based on Mr. Brock's wife's testimony against him at trial. The district court found that the marital evidentiary privileges had been waived when she testified at his pretrial detention hearing. Over her objection, she was then ordered to testify against Mr. Brock at trial. We agree that the spousal communication privilege was waived, and we find that Mr. Brock lacks standing to challenge the finding that the separate spousal testimonial privilege was waived.

Mr. Brock's challenge to his sentence depends on whether unlawful possession of a machinegun counts as a "violent felony" under ACCA. In *United States v. Upton*, 512 F.3d 394 (7th Cir. 2008), we held that unlawful possession of a sawed-off shotgun counted as a violent felony under ACCA. Applying *Upton*, the district court ruled that possessing a machinegun was also a violent felony and that Mr. Brock's three separate convictions for possessing machineguns triggered ACCA. Although the district court properly applied controlling circuit law, we have recently overruled *Upton* on this point, holding now that unlawful possession of a sawed-off shotgun no longer counts as a violent felony. *United States v. Miller*, ___ F.3d ___ (7th Cir. 2013). The reasoning of *Miller* applies equally to unlawful possession of a machinegun, so we vacate Mr. Brock's sentence and remand for sentencing.

I. *Factual and Procedural Background*

In 1998 Mr. Brock was convicted on three counts of unlawful possession of machineguns, two counts of unlicensed dealing in explosives, and criminal conspiracy. According to the presentence report from that case, Mr. Brock and his two co-conspirators had purchased at least a dozen semi-automatic rifles in Kentucky, removed their serial numbers, and converted them into fully automatic weapons, that is, machineguns. They then transported the guns to Indiana and sold them, along with some blasting caps and detonating cord, to undercover federal agents. The machinegun sales were federal crimes under 18 U.S.C. § 922(o)(1), which makes it "unlawful for any person to transfer or possess a machinegun" unless it was lawfully possessed prior to 1996. Mr. Brock's partners pled guilty and testified for the government at his trial. Mr. Brock was found guilty and was sentenced to 108 months (nine years) in prison. There is no indication that Mr. Brock or his co-conspirators ever engaged in any acts of violence.

After his release from prison in the machinegun case, Mr. Brock married, started a business, and purchased a rural Indiana home where he lived with his family. Also present in the Brock home were several firearms — a 12-gauge shotgun, a .22-caliber rifle, and a .38-caliber revolver. Section 922(g)(1) prohibits any person convicted of a felony from possessing virtually any firearm that has ever crossed a state or national border. In 2009 federal agents received a tip about the guns and obtained a search warrant for the Brock home. As

Mr. Brock was pulling out of his driveway, he realized the agents were arriving. He fled in what became a high-speed chase along the winding, hilly roads in the area. Mr. Brock eventually circled back to his home, where he was detained with the assistance of a police dog and a taser.

He was charged with violating 18 U.S.C. § 922(g)(1) and quickly appeared before a magistrate judge for a detention hearing. Mr. Brock's retained counsel (not the counsel at trial or on appeal) called his wife to testify in support of his release pending trial. She testified on direct examination that Mr. Brock had only recently returned home from working out of state and that he was the household's sole provider. On cross-examination, the government asked Mrs. Brock whether "Mr. Brock knew that . . . firearms were in the residence." This question was relevant to the detention issue but still should have set off several alarm bells for defense counsel. The question was beyond the scope of direct examination, it went to the heart of the charges against Mr. Brock, and it clearly threatened both the marital evidentiary privileges discussed below. Mr. Brock's lawyer objected, but on the meritless ground that the question called for speculation. The objection was overruled and the question was rephrased.

In response to a short series of questions that turned out to be critical, Mrs. Brock admitted that she had seen Mr. Brock handle at least one firearm, that he had shot and killed two possums with one, and that shortly before the government search, he had asked her to move

two firearms from the residence to the back seat of their car. Finding that Mr. Brock was a flight risk and a danger to the community, the judge detained him pending trial.

In preparing for trial, the government subpoenaed Mrs. Brock to testify for the prosecution. With separate counsel, Mrs. Brock moved to quash the subpoena. She invoked the two marital privileges — the spousal testimonial privilege, which prevents one spouse from being compelled to testify against the other in a criminal trial, and the marital communications privilege, which protects both spouses against in-court disclosures of confidential statements made between them. Before trial, the district court denied the motion to quash, finding that Mrs. Brock had waived the spousal testimonial privilege because she had already given testimony against Mr. Brock in his detention hearing. The court also found that both Mr. and Mrs. Brock had waived the marital communications privilege as to anything she said in the detention hearing, including her testimony that Mr. Brock told her to move the two guns to the car. The court said it would entertain specific objections at trial to any questions seeking new information protected by the marital communications privilege.

At trial, the government called Mrs. Brock to testify. The court overruled Mr. Brock's objections to the court's waiver findings. Mrs. Brock was a reluctant witness, but she eventually repeated the crux of her earlier testimony: that Mr. Brock had known the firearms were in the home, that he had handled each of the three firearms in question, that he had used one to shoot

some possums, and that he had asked her to move two of them from the residence to the car. No other witness testified that Mr. Brock had used the firearms or had known they were in the home, so Mrs. Brock's testimony was important to prove that Mr. Brock knowingly possessed the firearms.

The jury found Mr. Brock guilty on all counts. At sentencing the principal legal issue was whether Brock's prior convictions for unlawful possession of machineguns were violent felonies. The district court followed our decision in *United States v. Upton*, 512 F.3d 394 (7th Cir. 2008), which held that possession of a sawed-off shotgun was a violent felony under ACCA, and imposed ACCA's mandatory minimum sentence of fifteen years in prison. This appeal followed.

II.  *The Marital Privileges*

We first consider the challenge to Mr. Brock's convictions, which depends on whether the district court erred in finding that the Brocks had waived their marital privileges. There are two distinct marital evidentiary privileges under federal law: the marital communications privilege and the adverse spousal testimonial privilege. *United States v. Byrd*, 750 F.2d 585, 589 (7th Cir. 1984). The two privileges are different in scope and in terms of how and by whom they may be asserted or waived. We address first the marital communications privilege and then turn to the spousal testimonial privilege.

A. *The Marital Communications Privilege*

The marital communications privilege covers "information privately disclosed between husband and wife in the confidence of the marital relationship . . . ." *Trammel v. United States*, 445 U.S. 40, 51 (1980); *Blau v. United States*, 340 U.S. 332, 333 (1951). The marital communications privilege belongs to both spouses, so either spouse may invoke the privilege to avoid testifying or to prevent the other from testifying about the privileged communication. See *United States v. Lea*, 249 F.3d 632, 641 (7th Cir. 2001). The marital communications privilege exists "to ensure that spouses . . . feel free to communicate their deepest feelings to each other without fear of eventual exposure in a court of law." *United States v. Lofton*, 957 F.2d 476, 477 (7th Cir. 1992), quoting *Byrd*, 750 F.2d at 590. The marital communications privilege applies even after the marriage has dissolved, but the protected subject matter includes only what one spouse communicates to the other, not what one spouse learns about the other in other ways, such as by observing the other's actions. See *Lofton*, 957 F.2d at 477. In Mr. Brock's trial, the marital communications privilege could have applied to Mrs. Brock's testimony that he told her to take two guns from their home and put them in a car. It would not have applied to her testimony about Mr. Brock handling the guns or shooting possums.

The district court found that both Mr. and Mrs. Brock had waived this privilege when Mrs. Brock testified without objection in the detention hearing that he had

told her to move two guns from the house to the car. We agree. As with other privileges governing communications, such as the attorney-client privilege, an unprivileged disclosure amounts to a waiver.

In developing the federal law of privilege, other circuits have affirmed findings of implied waiver of the marital communications privilege when the witness-spouse testified to marital confidences in a pretrial proceeding and the party-spouse failed to object. See *Morganroth & Morganroth v. DeLorean*, 123 F.3d 374, 383 (6th Cir. 1997) (party-spouse's failure to object to witness-spouse's deposition testimony about confidential communications waived the marital communications privilege for trial as to those statements); *United States v. Dien*, 609 F.2d 1038, 1043–44 (2d Cir. 1979) (defendant-spouse waived marital communications privilege by failing to object to wife's testimony at suppression hearing); see also *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 667–69 (9th Cir. 2003) (deposition testimony about privileged conversations waived the confidential marital communications privilege for trial) (applying California law of evidence in diversity case).[1]

These decisions are consistent with the more frequently litigated issue of waiver of the attorney-client

---

[1] Numerous state court decisions are in agreement. See, *e.g.*, *Northern RR. Co. v. Hood*, 802 P.2d 458, 465 (Colo. 1990) (failure of husband's attorney to object at deposition to wife's testimony about conversations with husband waived marital communications privilege).

privilege in pretrial proceedings. See, *e.g.*, *Hawkins v. Staples*, 148 F.3d 379, 384 (4th Cir. 1998) (deposition testimony about confidential conversation with lawyer waived attorney-client privilege); *United States v. Billmyer*, 57 F.3d 31, 36–37 (1st Cir. 1995) (disclosure of confidential communications to government investigators waived attorney-client privilege for criminal trial); *United States v. Suarez*, 820 F.2d 1158, 1160 (11th Cir. 1987) (defendant's testimony at hearing to withdraw guilty plea about confidential conversation with attorney waived attorney-client privilege as to subject for trial).[2]

Mr. Brock contends that his wife's pretrial testimony did not waive the privilege because the waiver could not have been "knowing, voluntary, and intentional." Appellant's Br. at 46, citing *In re Pebsworth*, 705 F.2d 261, 262 (7th Cir. 1983) (finding waiver of state-law psychotherapist-patient privilege under this

---

[2]  See also 8 *Wigmore on Evidence* § 2328 at 638–39 (McNaughton rev. 1961) ("A waiver [of attorney-client privilege] at one stage of a trial should be final for all further stages, and a waiver at a first trial should suffice as a waiver for a later trial, since there is no longer any reason for preserving secrecy."); Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* 299 (4th ed. 2001) ("Failure to make an adequate or timely objection to disclosure either in responding to interrogatories, giving testimony in depositions or in producing documents may well be fatal to any successful assertion of the privileged matter at trial. . . . Likewise, disclosure in court effects a waiver.").

more stringent standard, without expressly deciding whether that standard or a less stringent standard should apply). While waiver of certain constitutional rights must be "knowing, voluntary, and intelligent," see, *e.g.*, *Iowa v. Tovar*, 541 U.S. 77, 88 (2004) (right to counsel); *Illinois v. Allen*, 397 U.S. 337, 343 (1970) (right to be present at trial); *Boykin v. Alabama*, 395 U.S. 238, 243 n.5 (1969) (guilty plea), this standard generally does not apply to common law privileges protecting confidential communications. See generally 26A Charles Alan Wright et al., Federal Practice and Procedure § 5726 (1st ed.) (discussing waiver standards but indicating rule might be different for spousal testimony).

We conclude that a waiver of the marital communications privilege must be "voluntary" only in the sense that the holder must realize that the once-confidential communication is being revealed. "But if the holder intends to disclose the privileged material, [even] 'without realizing the impact' of the disclosure on the privilege, then there is a waiver." *Id.* § 5726; see *United States v. Rakes*, 136 F.3d 1, 5 (1st Cir. 1998) (finding no waiver of marital communications privilege, but stating: "Ordinarily, deliberate disclosure of a privileged communication, where no privilege protects this further disclosure, waives a communications privilege. . . . The restriction is one of public policy, and applies regardless of the privilege holder's subjective intent.") (citations omitted). "There can be no disclosure of that which is already known, for when a secret is out, it is out for all time, and cannot be caught again like a bird, and put back in its cage." *People v. Bloom*, 85 N.E. 824, 826 (N.Y. 1908).

We agree with the district court that what happened in the detention hearing amounted to a clear waiver of the marital communications privilege as to the communications that Mrs. Brock described in her testimony. The disclosure was made voluntarily and without pertinent objection to try to protect the confidentiality of any communications between Mr. and Mrs. Brock. The district court did not err by overruling the objections to Mrs. Brock's trial testimony based on the marital communications privilege.

B. *Spousal Testimonial Privilege*

The second marital privilege, the spousal testimonial privilege, applies to any adverse testimony one spouse might provide as a witness against the other in a criminal case. It is both broader and narrower than the marital communications privilege. It is broader in that it covers testimony on any adverse facts, no matter how they might have become known to the witness-spouse. It is narrower in that it applies only to adverse testimony in a criminal case, and it applies only during the marriage. See *Byrd*, 750 F.2d at 590–91; *United States v. Fisher*, 518 F.2d 836, 838 (2d Cir. 1975). Until the Supreme Court's decision in *Trammel*, either spouse could invoke the spousal testimonial privilege, so that a defendant could prevent his spouse from testifying against him, even willingly. See, *e.g.*, *Hawkins v. United States*, 358 U.S. 74, 78–79 (1958). In *Trammel v. United States*, however, the Court modified the privilege so that

only the witness-spouse can invoke the privilege to refuse to testify adversely. 445 U.S. 40, 53 (1980). In Mr. Brock's trial, the spousal testimonial privilege could have applied to any of Mrs. Brock's testimony.

The district court found that Mrs. Brock had also waived this privilege by testifying in the detention hearing. Mr. Brock appeals that ruling, but the government counters that he lacks standing to raise the issue since this privilege belonged only to his wife. We said as much in *United States v. Lofton*, 957 F.2d 476, 477 n.1 (7th Cir. 1992), where the district court similarly found that the defendant's wife had waived the spousal testimonial privilege for purposes of trial by testifying at a pretrial suppression hearing without objecting or claiming the privilege. Relying on *Trammel*, we concluded that because the defendant-spouse could not invoke the privilege, he also could not appeal a rejection of the privilege. Accord, *United States v. Anderson*, 39 F.3d 331, 350 (D.C. Cir. 1994), abrogated on other grounds, *Richardson v. United States*, 526 U.S. 813 (1999); *Grand Jury Subpoena of Ford v. United States*, 756 F.2d 249, 255 (2d Cir. 1985). In view of *Trammel* and our decision in *Lofton*, Mr. Brock has no standing to raise this issue.

We recognize that there are several consequences of this rule. Our circuit's rule on this issue makes it especially important for defense counsel to stay alert. Nothing should stop counsel for the defendant-spouse from raising an objection to the witness-spouse's testimony to ensure that she knows she cannot be required to testify against the defendant-spouse.

We also recognize that a consequence of the *Lofton* rule on standing to invoke the privilege is that when a trial court rejects a witness-spouse's claim of privilege, appellate review of that decision may require the witness-spouse to refuse to comply with the court's order to testify and to be found in contempt of court. An emergency appeal of such matters in the middle of the defendant-spouse's criminal trial could be highly disruptive, of course, but we agree with the government that the logic of the *Trammel* limit on who can invoke the privilege leads to that path for appellate review. See, *e.g.*, *Blau v. United States*, 340 U.S. 332 (1951) (on appeal from contempt order, reversing sentence for justified refusal to testify). By resolving the issue here nearly a week before trial, Judge McKinney handled the issue well, so that there would have been time for emergency consideration before the trial began.

Given the importance of the spousal testimonial privilege, it would also be entirely appropriate and often prudent for the court, even in the absence of an objection, to make sure that the testifying spouse understands that she cannot be required to testify against her spouse, especially if she does not have her own counsel. See *United States v. Sims*, 755 F.2d 1239, 1244 (6th Cir. 1985); *United States v. Lewis*, 433 F.2d 1146, 1150 (D.C. Cir. 1970); *Commonwealth v. Stokes*, 374 N.E.2d 87, 96 n.9 (Mass. 1978) ("as a matter of good trial practice the judge should satisfy himself, outside the presence of the jury, that the spouse who is about to testify against the other in a criminal proceeding knowingly waives his or her statutory privilege"). Cf. *United States v. Thompson*,

454 F.3d 459, 464 (5th Cir. 2006) ("Defendants point to no case law that suggests that a witness must be affirmatively warned of the right not to testify against his or her spouse.").

The bottom line, however, is that under the logic of *Trammel* and the precedent of *Lofton*, Mr. Brock does not have standing to appeal the district court's finding that his wife waived the spousal testimonial privilege. Since he cannot prevail on either of his challenges to his wife's testimony at trial, his convictions are affirmed.

III. *The Armed Career Criminal Act*

Mr. Brock also challenges his sentence. He contends that the district court erred in concluding that his three convictions for possessing machineguns qualified as "violent felonies" under the Armed Career Criminal Act (ACCA). Whether a prior conviction is a violent felony under ACCA is a legal conclusion that we review *de novo*. *E.g.*, *United States v. Sykes*, 598 F.3d 334, 335 (7th Cir. 2010), *aff'd*, 131 S. Ct. 2267 (2011). On appeal, Brock has acknowledged our holding in *United States v. Upton*, 512 F.3d 394 (7th Cir. 2008), that possession of a sawed-off shotgun is a violent felony under ACCA, but argues that intervening Supreme Court decisions have called *Upton* into doubt. In our recent decision in *United States v. Miller*, ___ F.3d ___ (7th Cir. 2013), we agreed with those arguments, overruled *Upton*, and held that possession of a sawed-off shotgun is not a violent felony under ACCA.

Without repeating *Miller*'s analysis of the involved arguments and the extensive and evolving case law on the issue, the reasoning of *Miller* applies equally to mere possession of a machinegun. Sawed-off shotguns and machineguns are both dangerous and can be used to commit violent crimes, of course. But the same is true of explosives, and ACCA specifies that only crimes involving the *"use* of explosives" count as violent felonies. 18 U.S.C. § 924(e)(2)(B)(ii) (emphasis added). Congress has grouped together sawed-off shotguns, machineguns, and a variety of dangerous explosive devices for stringent restrictions on possession and strict registration requirements for those that can be possessed lawfully. 26 U.S.C. §§ 5841–5845. And as dangerous as all these weapons can be, we see no principled basis for distinguishing between sawed-off shotguns and machineguns in terms of whether mere possession is a violent felony under ACCA. We must therefore vacate Mr. Brock's sentence. He is entitled to be resentenced without being subject to the enhanced penalties of ACCA.

Accordingly, Mr. Brock's convictions are AFFIRMED but his sentence is VACATED and the case is REMANDED to the district court for resentencing.