2020 IL App (2d) 190412
No. 2-19-0412
Opinion filed June 25, 2020

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 16-CF-239 |
| MELODIE GLINIEWICZ, | ) ) | Honorable James K. Booras, |
| Defendant-Appellee. | ) | Judge, Presiding. |

PRESIDING JUSTICE BIRKETT delivered the judgment of the court, with opinion. Justices Hudson and Brennan concurred in the judgment and opinion.

**OPINION**

¶ 1    The State appeals the trial court's order granting defendant, Melody Gliniewicz's, amended motion *in limine* to bar, as protected by marital privilege, evidence of electronic communications between her and her deceased husband, Charles Joseph Gliniewicz (Joe), that the police recovered from his cell phone. For the following reasons, we reverse.

¶ 2    This case comes before us for the third time. In *People v. Gliniewicz*, 2018 IL App (2d) 170490 (*Gliniewicz I*)[1], the State appealed the trial court's order granting defendant's original

---

[1] In *People v. Gliniewicz*, 2019 IL App (2d) 190401-U (*Gliniewicz II*), the Village of Fox

motion *in limine* to bar evidence of electronic communications between her and Joe, specifically those that were recovered from his cell phone and were related to their alleged criminal conduct. The trial court held that the communications were protected by marital privilege. We granted a limited remand in *Gliniewicz I* to permit the State to reopen the proofs on the motion *in limine* and present newly discovered information that, in October 2015, defendant consented to a search of her cell phone. On remand, the trial court denied the State's motion to reopen the proofs. We affirmed the order granting the defendant's motion *in limine* but reversed the order that disallowed the reopening of the proofs. *Id.* ¶¶ 39, 50. We held "that the State has, by its representations to the trial court and by the exhibits, made a *prima facie* case" that defendant waived her marital privilege. *Id.* ¶ 50. Since the facts regarding defendant's "waiver/consent" were contested, we reversed the order denying the motion to reopen the proofs and remanded for further proceedings. *Id.* ¶ 52.

¶ 3    On remand, defendant filed an amended motion *in limine* to bar evidence of electronic communications between her and Joe. The court granted the motion. For the following reasons, we reverse.

¶ 4                          I. BACKGROUND

¶ 5    Defendant was indicted by a Lake County grand jury on January 27, 2016. Four counts of the indictment accused defendant of disbursing charitable funds without authority and for personal benefit (225 ILCS 460/19 (West 2016)). Two counts accused defendant of money laundering (720

---

Lake intervened and appealed an injunction that the trial court issued pursuant to defendant's motion for discovery sanctions and we reversed the trial court's order. *Gliniewicz II* has no bearing on the issues in this appeal.

ILCS 5/29B-1(a)(1)(B)(i) (West 2016).  On March 9, 2016, the grand jury returned an indictment adding four additional counts: one alleged disbursing charitable funds without authority and for personal benefit (225 ILCS 460/19 (West 2016)), one alleged conspiracy (disbursing charitable funds without authority and for personal benefit (720 ILCS 5/8-2(a) (West 2016); 225 ILCS 460/19 (West 2016)), and two alleged conspiracy (money laundering) (720 ILCS 5/8-2(a), 29B-1(a)(1)(B)(i) (West 2016)).  These charges alleged that Joe participated in the commission of these offenses as part of a scheme to steal funds from the Fox Lake Police Explorer Post Program. Explorer Posts, which are affiliated with the Boy Scouts of America, give young adults the opportunity to learn about law enforcement by working with local law enforcement agencies.

¶ 6      The State disclosed that it would seek to introduce electronic communications (e-mail and text messages) between defendant and Joe that were recovered from Joe's cell phone pursuant to a search warrant.  On January 30, 2017, defendant filed her original motion *in limine* to bar the State from introducing the electronic communications between her and Joe, based on marital privilege.  Defendant maintained that these confidential communications were obtained without her knowledge or consent.  Defendant originally argued that she had taken no action to reveal these communications, as was the case in *People v. Simpson*, 68 Ill. 2d 276, 280 (1977) (recognizing the third-party exception to marital privilege).  *Gliniewicz I*, 2018 IL App (2d) 170490, ¶¶ 9-10.  After the opening briefs were filed in *Gliniewicz I*, the State filed an "Emergency Motion for a Remand to Reopen Proofs," based on newly discovered information that on October 8, 2015, after speaking to her attorney, defendant had signed a written consent to search her cell phone.  *Id.* ¶ 11.  The State attached a copy of the consent form as well as a copy of the "Lake County Major Crimes Task Force" (task force) report documenting a conversation between defendant and Detective Andrew Jones.  *Id.* ¶ 12.  We granted the State's motion in part and remanded the case for " 'the

limited purpose of the trial court's consideration of the State's request to reopen the proofs on defendant's motion *in limine* regarding marital communications and other necessary proceedings pertaining to that motion.' " *Id.* ¶ 15. On remand, the trial court denied the State's motion to reopen the proofs. *Id.* ¶ 26.

¶ 7 In *Gliniewicz I*, we rejected the State's arguments that the third-party exception applied to the communications discovered on Joe's phone. *Id.* ¶ 37. We also rejected the State's argument that we should adopt the joint-criminal-enterprise exception to the marital privilege. *Id.* ¶ 38. We noted that, although foreign jurisdictions have recognized the joint-criminal-enterprise exception, Illinois appellate courts had rejected it and the trial court was bound by those courts' decisions. *Id.*

¶ 8 Although we found that the trial court did not err in its initial ruling granting defendant's motion *in limine*, we held that it abused its discretion in denying the State's motion to reopen the proofs and we remanded for further proceedings. *Id.* ¶ 52. We determined that the State had made a *prima facie* case of waiver. *Id.* ¶ 50. We also rejected defendant's argument that the circumstances surrounding the consent to search defendant's phone were irrelevant because the State could not produce any evidence as to what was contained on her phone, which, the State represented, had been returned to defendant without being searched. We noted that "defendant's motion *in limine* challenged the admissibility of communications between defendant and Joe recovered from Joe's phone and tendered in discovery." *Id.* ¶ 48. Our mandate in *Gliniewicz I* was issued on January 17, 2019, and filed in the trial court on January 22, 2019. On remand, defendant did not request a hearing on the voluntariness of her consent. Instead, on February 4, 2019, defendant filed her "Amended Motion *In Limine* (with exhibits)." Defendant's amended motion pointed out that, contrary to the State's earlier representation, defendant's phone had been

searched before it was returned to her. Defendant noted that the State had recently submitted an extraction report showing what was on defendant's phone at the time she tendered it to law enforcement. According to defendant, the report "shows that at the time she signed the consent to search her phone, and contrary to the State's assertion in the trial court and the appellate court, the communications on defendant's phone were not 'identical' to nor were they 'mirror images' of the communications on her late husband's phone." Defendant's motion argued that, at the time we issued our opinion in *Gliniewicz I*, we "labored under the misapprehension that there was no extraction report showing the contents of defendant's phone at the time she signed the consent." Defendant noted that we "did not discuss whether the *prima facie* case of waiver was limited to communications found on defendant's phone at the time of consent." Defendant conceded that, "for purposes of this motion," she waived the marital privilege as to the communications between her and Joe "found on her phone at the time she signed the consent." Defendant argued that additional communications found on Joe's phone, but not recovered from her phone, "are inadmissible pursuant to the marital communications privilege and should be barred." In a footnote to her motion, defendant reserved the right to ask for an evidentiary hearing on unresolved factual issues, including the "voluntariness of any alleged consent by her."

¶ 9    The State renewed the arguments it made in *Gliniewicz I* that an exception to the marital-communications privilege should be applied in this case. The State also repeated its argument that the admissibility of the communications should be considered under the marital privilege and not under section 115-16 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-16 (West 2016)), which generally bars spouses from testifying "as to any communication or admission made by either of them to the other or as to any conversation between them during marriage[.]" The

State also argued that defendant's consent to search her phone was not conditioned on the type of search to be performed. The consent form contained the following printed acknowledgement:

"1. I have been asked by Special Agent of the Federal Bureau of Investigation to permit a complete search of: Samsung Galaxy S5 847-***-****. ***

2. I have been advised of my right to refuse consent.

3. I give this permission voluntarily.

4. I authorize these agents to take any items which they determine may be related to their investigation."

Attached to the consent form is a document listing the backup password for defendant's cell phone.

¶ 10    On March 5, 2019, the parties appeared in court for the first time following our remand. Defense counsel informed the trial court that the parties have "an extraction report on her phone, which shows what was on her phone at the time she tendered it to law enforcement." Counsel said that, "based upon the appellate court's ruling," defendant "waived [the marital] privilege as to those communications that were on the extraction report."

¶ 11    The State announced that it had issued a subpoena for Sprint records needed to respond to defendant's amended motion *in limine* regarding marital privilege. The State argued that the Sprint records would be "completely and 100 percent irrelevant" because they would show only that a text was sent or received, but not the content. The State stated that "the appellate court said, well, she waived what was on her phone at the time."

¶ 12    On April 10, 2019, the defense requested a hearing on defendant's motion *in limine* to bar marital communications. The parties agreed to introduce the following exhibits marked as the

People's exhibits: (1) "MUD's and Toll's"[2] with defendant's objection on relevance grounds preserved; (2) Sprint records for Joe's phone; (3) the stipulation to a 1122-page extraction report of defendant's phone; (4) a 6502-page report from Joe's phone (placed under seal by agreement); (5) video and audio recordings of defendant's interview on October 8, 2015, by task force personnel and an FBI agent; and (6) the FBI consent-to-search form signed by defendant. The trial court admitted all six exhibits.

¶ 13    The recordings of defendant's October 8, 2015, interview filed in the common-law record were not compatible with this court's media player. On February 20, 2020, we ordered the State to file within 14 days a recording that was playable on "Windows Media Player or VLC Media Player." The State complied with that order and filed a 75-page transcript of the interview. We have watched and listened to the interview and we note that the transcript is only an aid.

¶ 14    During the October 8, 2015, interview, defendant discussed in detail her relationship with Joe. The police explained that they wanted to clear up some things and "find out what happened to Joe." Early in the interview, defendant answered questions about the events leading up to September 1, 2015—the day Joe was found dead from gunshot wounds. Defendant explained that, the night before Joe was found dead, "he told me that Anne Marrin [(the village administrator)] was demanding a 100% inventory of all the Explorer stuff. From every patch to every uniform to every item in the building." Defendant said, "he had sent me a text saying come grab some stuff out of his car because we were in the process of changing the Explorer Post from the PD to the American Legion because he still wanted to do the Explorers but since he wasn't going to be an

---

[2] People's exhibit No. 1 is a readout of when calls and texts were sent or received by the cell phone number, along with the other telephone number involved.

employee of the PD, we wanted it someplace where we could still be active in it." Defendant explained that they were supposed to do the final paperwork on "Tuesday morning" but that they never did. Defendant said that Joe "was pissed because [Marrin] was trying to fold the Explorer program." Defendant explained that Marrin, who was on her second year as village administrator, was "riding his ass." Defendant explained that the "biggest stressor was Anne Marrin. The biggest stressor was the internal investigation that was going on. And him watching what it was doing to the guys."

¶ 15    Defendant was asked, "[s]o directed at just Joe, what else did [Marrin] want from him? She wanted the inventor[y] of the—" and defendant interjected "Explorers. She wanted control of their money." Defendant explained that the Explorers had a bank account but did not have a "shit ton of money."

¶ 16    Defendant explained that Joe was "done with Fox Lake." He did not enjoy it anymore and it was "hell" dealing with Marrin. Defendant explained that "there was more times than not that I would be on his personal cell phone, and she would call his work phone and he'd have it on speaker and I mean—'I'm so sick and tired of your f*** shit, Gliniewicz. Get this f*** shit done. I want it f*** now.' " Defendant explained that she had never been properly introduced to Marrin but that the previous December, Marrin had walked up to Joe and said "[t]ell your f*** worthless wife to keep her f*** mouth shut."

¶ 17    Defendant discussed a number of personal issues in her marriage to Joe, including finances and stress and his affairs, alcohol use, and sleep deprivation.

¶ 18    Defendant explained that the Explorer program took up a lot of Joe's time and sometimes it became a "thorn" in his side but that she was still a part of it "on the checking account." Defendant was asked if Joe brought Explorer stuff, "a couple of footlockers [of] stuff[,] to the

house," and she said that she had not looked but that she knew that he sent her a "text message" about it. Defendant said that the police could come and look, saying, "[y]eah, I got nothing to hide. I can give a flying f***." Defendant mentioned that she had an attorney.

¶ 19 When the police asked defendant if she had questions, she replied, "[t]here is nothing you will answer. It's the same." Next, she was asked if she was afraid of something about Joe coming out. Defendant explained that Joe "could be an ass" and that he sent out negative e-mails. One of the investigators commented that "[w]e all bitch and complain." Defendant then said, "[i]t is what it is, I know when he would use the Explorer credit card, we always paid that back, you know, so, I mean, that was just one of those things that shit we—." Defendant explained that she and Joe "owe for airline tickets for [defendant's son]." Defendant explained that they were not "embezzling funds," because they paid it back. Defendant said that she thought she owed the Explorer program "about $1,000." Defendant said that she still had access to the account.

¶ 20 Defendant was told that questions had come up in the process of retrieving text messages. The following exchange took place:

> "[Officer]: Okay, and another text message that popped up, and its—kind of threw up a red flag, was a conversation that sounds like with possibly you and Joe, maybe something about hiding the money before the Village Manager finds out. Do you know anything like that or any texts like that?
>
> [Defendant]: Huh?
>
> [Officer]: Something about there was a fear you guys were going to get in trouble with maybe some money and it was about hiding the money or something.
>
> [Defendant]: No.

[Officer]: Well, it was either between Joe and you or Joe and Behan or somebody like that. I think Joe's concern was—what we're guessing is—that the Village Manager was going to find out that there was an in and out money—

[Defendant]: And that may have been—

[Officer]: Okay, do you know—

[Defendant]: But I wouldn't have said 'hide the money.'

[Officer]: Okay, do you know if he ever made a comment like that or something?

[Defendant]: No, because anytime he'd borrow, he'd let me know and I'd be like 'okay, fine, we'll put it on the tally.' "

¶ 21    Defendant said that she did not know how much money went in and out of the Explorer account over the years. She said that, for a long time, Joe was "having like $100 of his paycheck deposited into the Explorer account."

¶ 22    The police asked if they could come to defendant's home to follow up on the "footlocker issue," adding, "then another thing is they want to take a look at your phone. Just so they can say they went through it. Now, that is completely up to you." Defendant responded, "[w]ell, I mean, what part of my phone do they want? All of the text messages between Joe and me?" The police told defendant that they had "dumped everything on everyone's phone" and were "trying to leave no stone unturned. That's what it's about." Defendant said that they were "trying to vilify Joe." Defendant said that she wanted the "pain to stop" and that she wanted her "life back." Defendant was told that "it doesn't take long to unload the phone, so that's what they want us to ask you." Defendant said, "[n]ot right now. Not right now. I mean, it doesn't matter if I delete anything off—you're still able to pull it. So, I mean, let's not treat me like I'm a stupid idiot." Defendant was told that, if she did not consent, the police would have to get a search warrant. Defendant said

that she was "trying not to have a f*** major meltdown right now." She said that she was at a point where she didn't "give a f*** about anything anymore, so—you guys got to do what you've got to do."

¶ 23    Defendant allowed the police to go to her home to see what was in the footlocker, and she signed a consent to search but did not want her phone included. She said, "I don't know, I want to call my attorney on that one." The investigator said, "Okay, alright. Then I would just sign on the footlocker for now, give your attorney a call about the phone, and I'm going to call the boss and tell him to go ahead and—." Defendant said that she was "feeling threatened." The investigator explained that they would take care of the phone later and take care of "the footlocker now." Defendant responded, "[h]onestly, you're just going to find the same shit on my phone that you're going to find on Joe's phone. So, I don't give a flying f*** anymore. My life is over." The investigator suggested that they head to defendant's house to "take care of the footlocker first." Defendant asked, "[w]here do you have to do the phone at?" She was told that the phone would have to go to "Round Lake ATF station—They'll download it and we'll return it to you." Defendant expressed concern about the phone being returned to her promptly. The investigator explained that "[a]ll of the phones so far have been cloned and returned." He suggested that defendant call her attorney "to talk to him first and see what he says, but I do know that our bosses want your phone and whether I'm taking it now. I'll tell them 'no, hey, she said no. She's going to call her lawyer. She doesn't want to consent.' And then they'll call Pavletic [(the Assistant State's attorney in charge of the task force)], and Pavletic will make a decision whether he believes there's enough for a subpoena or not." The investigator explained that, if Pavletic believed that a search warrant was necessary, then they would deal with it then and that, if "he doesn't, if he says there's not enough, then they won't. They won't take the phone." Defendant then said, "Yeah, I

mean, if you've got Joe's phone and all the stuff off of there, then you know what the messages are between us." The investigator assured defendant that they would not have her phone for "months or weeks like they have your computer, okay?" Defendant remarked that her phone was her "only lifeline" to her children. The interview ended with the suggestion that they head to defendant's home where they could take care of the footlocker and further discuss the phone.

¶ 24    At the hearing on the motion *in limine*, defense counsel argued that, during the appeal in *Gliniewicz I*, "[w]e didn't know what was on her phone, so we were belaboring under, and the State adamantly took the position that this box [(presumably the report on Joe's phone)] was identical to the extraction report on her phone." Counsel noted that there were nine months of text messages found on Joe's phone that were not found on defendant's phone. Counsel argued that, while defendant waived her privilege as to what was on her phone, she could not have waived any privilege "as to communications that were on Lieutenant Gliniewicz's phone."

¶ 25    The State incorporated "all arguments made on this matter." The State focused its argument on its exhibits and defendant's waiver. The State explained that "People's No. 1 matches People's No. 2 matches People's No. 4. It doesn't match People's No. 3, which is defendant's extraction report." The State argued that "those messages *** prove the State's case." The State commented, "you have heard no explanation why those messages don't exist [(on defendant's phone)]." The trial court interrupted the State, stating, "[t]he burden is on you, not the defense." The State argued that the answer is simple: the messages were incriminating. The trial court commented, "[a]nd your argument is if she deleted those messages, she shouldn't be allowed to profit from her action." The State responded, "[t]hat's exactly where I'm going." The court then stated, "I probably would be very sympathetic to that argument, and I probably would make that argument myself. But under the presumption of innocence, is it allowed? That's my question."

¶ 26    The State argued that the circumstantial evidence proved that defendant intentionally deleted the incriminating text messages. The trial court asked, "[t]hose deleted messages could have been retrieved, right? If they were deleted, right?" The State explained that the deleted messages were not downloaded and that "the phone was returned back to this defendant expeditiously because she did volunteer to give up the phone." The trial court remarked that, during her conversation with investigators, defendant stated, "I know that you can retrieve deleted messages. Why would I delete those messages?" The State commented that defendant said, "[w]hat you are going to find on his phone is on my phone." The State argued that defendant's conversation with investigators, together with the consent to search, waived marital privilege as to the incriminating messages.

¶ 27    The trial court asked defense counsel why it should allow defendant to profit from her actions, "assuming that she deleted these messages." Defense counsel remarked that, "assuming that she did delete the text messages, then that was an action of saying, okay, this is privileged; I don't want you to see it, so she didn't waive it." The court commented, "I'm not saying that she did it. Maybe somebody else did." Defense counsel replied, "[o]r maybe she set up her phone— the point is we don't know why those text messages weren't there." Defense counsel argued that why the messages were missing was not relevant. "And that's not something we do in criminal cases is say, well, you should be penalized because you deleted your phone. She has got rights. She has got Fifth Amendment rights. She has got her spousal privilege." The trial court asked if the action of deleting messages is like "exercising Fifth Amendment rights?" Defense counsel replied, "[i]t is." The court commented, "[i]t could be obstruction of justice, too. That's a different story." Defense counsel responded that an argument could "potentially be made. But we have no idea when—if or when she deleted any of these text messages." Defense counsel added that

defendant was asked about sending a text message from April 14, 2015, and she denied it. The State objected, stating "[t]hat's not in evidence." Defense counsel responded that "[i]t is in evidence. It's in my reply, and it's in the video. She was asked several times specifically about the text messages on that date, and she denied making them."

¶ 28 The State argued that attorneys "don't proffer evidence ourselves and say this is what it is, judge." The court asked the State, "[y]ou mean it did not happen?" The State replied, "[j]udge, you have evidence in front of you." The court remarked, "[d]o you want me to go through all this voluminous evidence now to find it for you? It's not going to happen." The court took defense counsel's comments as an offer of proof. Defense counsel compared the facts in the case to those in *Simpson*, wherein the defendant admitted making a statement to his wife. Here, defendant was "asked about that statement. She categorically denied making it." Defense counsel argued that "it's not on that extraction report of her phone. It's not relevant." Further, "[t]he appellate court repeatedly said that in oral argument in this case. What happened then is not relevant. What's relevant is what was on her phone at the time she gave the phone to the investigators." Defense counsel argued that defendant did not waive privilege on anything else, "specifically the text messages on April 14th."

¶ 29 The trial court granted defendant's amended motion *in limine*. The court explained:

"First, the State has a right to inspect and extract and use information contained in Lieutenant Gliniewicz's phone. The State also has the right to, because there is a waiver, and to adhere to the pronouncement of the appellate court. Since there is a waiver to the content of the defendant's phone, they have to—they can use the information contained therein.

Now, the defendant has asserted her marital privilege as it comes to her phone. She has not waived her marital privilege as to the information that's contained within Lieutenant Gliniewicz's phone. There are explanations why there were—what's contained in Lieutenant Gliniewicz's phone is not contained in her phone. She may have changed phones. She may have switched SIM cards. I don't know. Maybe she was—what Sprint's records indicate is that there were communications back and forth to the telephone numbers, not the exact device. The exact device is depleted or contains whatever information. And perhaps she knew all of that, that there is nothing in there. That's why she said go right ahead and search it. She hasn't made a waiver as to the contents of that device. Now, if there is nothing in that device, there is nothing. She did not waive her marital privilege when it comes to communications with her husband that's contained in his phone, in Lieutenant Gliniewicz's phone. So, I am upholding that privilege at this juncture because this is the state of the law. This is the state of jurisprudence that recognizes the marital privilege for eons. Therefore, the State can use whatever is contained within that device because there is a waiver, and the appellate court did not have the contents at the time, and they could not visit it adequately. Now I think it will be visited adequately. Therefore, I will grant the defense's motion *in limine*."

¶ 30    On April 23, 2019, the State filed a lengthy motion to reconsider. In the motion, the State quoted questions and answers from defendant's October 8, 2015, interview with the police, as well as text message exchanges between Joe and defendant. The original motion to reconsider was filed under seal. A redacted copy was filed in the common-law record available to the public. The trial court then took time to review the State's motion to reconsider.

¶ 31    The State argued in its motion to reconsider that defendant's amended motion *in limine* was based on a misinformed and inaccurate understanding of the evidence. The extraction of defendant's phone, performed by the Illinois State Police, was only a logical extraction, which "does not capture hidden files or data in unallocated space (*i.e.* deleted text messages)." The State explained that the task force "inexplicably" returned the phone to defendant without having conducted either a "file system or physical extraction," which would have "yielded both files and unallocated space." The State pointed out that "[d]efendant's consent was not conditioned and did not dictate which extraction method was performed on the phone." The State again pointed out that "the messages that have not been deleted are identical on both phones." The State argued that the evidence showed that incriminating messages were intentionally deleted. The State argued that "[d]efendant waived marital privilege to the contents of Joe's phone during her October 8, 2015, interview with Lake County investigators and the consent form; and Joe Gliniewicz abandoned his phone and all expectations of privacy following his hoax attack."

¶ 32    When the case was recalled on April 23, 2019, the trial court said, "I still rely on the appellate court's decision," and it ruled that defendant's waiver extended only to "her phone." The trial court said that defendant was not in possession of nor had knowledge of what was on Joe's phone except for what she was told by police. The court commented, "[a]nd frankly, consent has to be knowing, voluntary, and informed. For those reasons, I'll deny the State's motion to reconsider." The State timely appealed.

¶ 33                                    II. ANALYSIS

¶ 34    In *Gliniewicz I*, we addressed whether the State's evidence, in the form of "its representations to the trial court and by the exhibits, made a *prima facie* case of waiver," and we held that it did. *Gliniewicz I*, 2018 IL App (2d) 170490, ¶ 50. *Id.* We also rejected the State's

arguments that (1) section 115-16 of the Code (725 ILCS 5/115-16 (West 2016)) bars spousal testimony, not communications themselves (*Gliniewicz I*, 2018 IL App (2d) 170490, ¶¶ 5, 33); (2) the text messages were admissible under the third-party exception (*Gliniewicz I*, 2018 IL App (2d) 170490, ¶ 37, citing *Simpson*, 68 Ill. 2d at 280); (3) the marital communications between defendant and Joe were admissible under the joint-criminal-enterprise exception (*id.* ¶ 38); and (4) the "agency" exception to the marital privilege should be expanded (*id.* ¶ 39).

¶ 35    The State argues that, on remand, defendant failed to rebut the *prima facie* case that her waiver/consent was voluntary.  For her part, defendant argues that the extraction report on her phone, which was not discovered until after our remand, is a game-changer because "this court now knows that defendant didn't consent to a search of her phone knowing that the police would find a text message between Lt. Gliniewicz and herself regarding the hiding of money."  Defendant argues that the "relevant timeframe for purposes of waiver is what was on her phone at the time of the consent, not the time the communication was made."  Defendant also argues that she denied making the April 14 "alleged text regarding 'hiding of money.' "  Defendant also notes that, in *Gliniewicz I*, we rejected the State's arguments that (1) section 115-16 of the Code bars spousal testimony, not communications, (2) the third-party exception should apply, and (3) we should adopt the joint-criminal-enterprise exception that exists in foreign jurisdictions.

¶ 36    In essence, the parties both ask us to apply our reasoning and holding in *Gliniewicz I*, so long as it supports their positions.  "The law-of-the-case doctrine prohibits the reconsideration of issues that have been decided by a reviewing court in a prior appeal."  *In re Christopher K.*, 217 Ill. 2d 348, 363 (2005).  The doctrine's purposes are "to avoid indefinite relitigation of the same issues, to obtain consistent results in the same litigation, and to ensure that lower courts follow the decision of the appellate courts."  *Id.* at 365.  There are two recognized exceptions to the law-of-

the-case doctrine: (1) a higher reviewing court makes a contrary ruling on the same issue subsequent to the lower court's decision, or (2) a reviewing court finds that its prior decision was palpably erroneous. *Radwill v. Manor Care of Westmont, IL, LLC*, 2013 IL App (2d) 120957, ¶ 10. In addition, a ruling will not be binding in a subsequent stage of litigation when different issues are involved, different parties are involved, or the underlying facts have changed. *American Service Insurance Co. v. China Ocean Shipping Co. (Americas), Inc.*, 2014 IL App (1st) 121895, ¶ 17. "[I]ssues presented and disposed of in a prior appeal are binding and will control in the circuit court on remand, as well as the appellate court in a subsequent appeal, unless the facts presented are so different as to require a different interpretation." *Bilut v. Northwestern University*, 296 Ill. App. 3d 42, 47 (1998).

¶ 37 Defendant argues that the facts here have changed because, "during the appeal in *Gliniewicz I*, this court, the State, and the defense all believed that law enforcement did not obtain or could not locate an extraction report showing the contents of defendant's phone after she consented to a search of her phone." Defendant argues that, contrary to the State's arguments in *Gliniewicz I*, the communications on defendant's phone were not "identical to" or "a mirror image" of those that would have been discovered on Joe's phone. Defendant maintains that, because the incriminating messages were not found on the extraction report from her phone, "she did not and could not have waived her privilege as to any communications between [Joe] and her that were not found on the extraction report of her phone."

¶ 38 While a trial court's ruling is generally reviewed for an abuse of discretion, we review *de novo* a trial court's decision regarding privilege. *Gliniewicz I*, 2018 IL App (2d) 170490, ¶ 32. Where the facts are not in dispute, whether a waiver has taken place is a legal question, and no deference is owed to the trial court's decision. *Id.* The burden of establishing that a privilege

applies is on the party claiming it, who must establish all the necessary elements. *People v. McNeal*, 175 Ill. 2d 335, 359 (1997).

> "Except as otherwise required by the Constitution of the United States, the Constitution of Illinois, or provided by applicable statute or rule prescribed by the Supreme Court, the privilege of a witness *** shall be governed by the principles of the common law as they may be interpreted by Illinois courts in the light of reason and experience." Ill. R. Evid. 501 (eff. Jan. 1, 2011).

"There is a presumption that interspousal communications are intended to be confidential." *People v. Sanders*, 99 Ill. 2d 262, 267 (1983).

¶ 39    The holder of a privilege may waive it explicitly or implicitly. See *People v. Hommerson*, 399 Ill. App. 3d 405, 412-14 (2010). Privileges such as the marital privilege "exclude relevant evidence and thus work against the truthseeking function of legal proceedings." *Sanders*, 99 Ill. 2d at 270. In *Simpson*, our supreme court stated that "[n]o case is cited to us that would uphold the privilege where the very holder of that privilege consciously, and by his own act, reveals or confirms to third parties the content of a prior privileged communication." *Simpson*, 68 Ill. 2d at 281.

¶ 40    In *Gliniewicz I*, we had only the State's proffer and the exhibits: a copy of the consent form to search defendant's phone and a copy of the task force report. We found that these documents established that defendant voluntarily revealed communications between herself and Joe that were otherwise privileged. Defendant knew that the police wanted to search her phone to see if there were text messages or other communications about "hiding money." Our examination of the October 8, 2015, interview confirms our holding that the State made a *prima facie* case of waiver.

¶ 41　　During the interview, the police told defendant that they wanted to clear some things up and find out what happened to Joe. Defendant was not in custody and she shared with the police several personal details of her marriage. The police told defendant that they had access to the text messages between her and Joe. Defendant volunteered that she and Joe borrowed from the Explorers account. She said that she and Joe were not "embezzling funds." The police asked defendant about the text message they found on Joe's phone about "hiding money." Although defendant denied using that language, she knew that the police were investigating the "hiding" of money and she replied, "But I wouldn't have said 'hide the money.' "

¶ 42　　Defendant said that she was "feeling threatened." The investigators explained that they could take care of the phone later and take care of the footlocker now. Defendant told the police that they would find the "same shit" on her phone as they would find on Joe's. She told the investigators that if they had Joe's phone "then you know what the messages are between us." Contrary to defendant's argument, defendant said that she knew that a search of her phone could recover deleted messages. Knowing this, she signed a consent authorizing a "complete search" of her phone, and she did so after consulting with her attorney.

¶ 43　　The fact that the relevant incriminating text messages do not appear on the extraction report on defendant's phone does not affect our determination that she waived her marital privilege as to the communications between her and Joe recovered from Joe's phone. We made clear in *Gliniewicz I* that the incriminating messages defendant sought to bar were the ones recovered from Joe's phone, not hers. *Gliniewicz I*, 2018 IL App (2d) 170490, ¶ 48. Defendant, by her own statements, knew that a "complete" search would have yielded *all* the text messages from her phone, including those she had deleted.

¶ 44    Finally, we note that, while waiver of certain constitutional rights must be " 'knowing, voluntary, and intelligent,' " this is not the standard to be applied to common-law privileges that protect confidential communications. *United States v. Brock*, 724 F.3d 817, 822 (7th Cir. 2013). "[A] waiver of the marital communications privilege must be 'voluntary' only in the sense that the holder must realize that the once-confidential communication is being revealed." *Id.* In *Simpson*, the supreme court made clear that " 'a voluntary revelation by the holder (of the privilege) of the communication, or of a material part, is a waiver.' " *Simpson*, 68 Ill. 2d at 281. Defense counsel argues that, because defendant denied using the term "hide the money," she did not waive marital privilege. We disagree. Defendant explained that she would not have used that term; however, she went on to reveal material parts of her conversations with Joe about when they would "borrow" money from the Explorer program. As in *Simpson*, defendant voluntarily acknowledged that her and Joe's phones would yield the same text messages and also voluntarily consented to a search of her phone. See *id.* at 281-82. The fact that defendant might not have appreciated the "impact of the disclosure" does not affect her waiver of the privilege. (Internal quotation marks omitted.) *Brock*, 724 F.3d at 822. Defendant authorized the police to do "a complete search" and to take "any items (text messages and e-mails) which they determine may be related to their investigation."

¶ 45    We note that defendant stated in a footnote to her amended motion *in limine* that she reserved the right to an evidentiary hearing on the issue of voluntariness. The issue of waiver is reviewed *de novo* when the facts are not contested. *Gliniewicz I,* 2018 IL App (2d) 170490, ¶ 32. Whether there has been a waiver includes the question of voluntariness. See *Simpson*, 68 Ill. 2d at 281-82. Here, defendant stipulated to the "voluntary statement to Detective Jones and Special Agent Young that was audio and video recorded." The stipulation was a judicial admission. A

judicial admission is " 'a formal act of the party or his attorney in court, dispensing with proof of a fact claimed to be true and is used as a substitute for legal evidence at the trial.' " *People v. Mindham*, 253 Ill. App. 3d 792, 797 (1993) (quoting *Rosbottom v. Hensley*, 61 Ill. App. 2d 198, 215 (1965)). We note that the stipulation is typed with signature lines for the attorneys. There is also a hand-printed note that reads "[f]or purposes of this hearing only," meaning that on the amended motion *in limine*. As we have stated, the issue raised in defendant's amended motion was whether defendant's waiver of her marital privilege was limited to the communications found on the extraction report from her phone or was a complete waiver (*i.e.*, of all the communications recovered from Joe's phone). At oral argument, defense counsel stated that, on remand, and based on new evidence (the extraction report on defendant's phone), defendant "abandoned her claim that the consent was not voluntary" and instead filed the amended motion *in limine*. Defendant might not have realized the impact of her disclosure of her communications with Joe, but once she intentionally revealed those communications, the " 'secret is out, it is out for all time, and cannot be caught again like a bird, and put back in its cage.' " *Brock*, 724 F.3d at 822 (quoting *People v. Bloom*, 85 N.E. 824, 826 (N.Y. 1908)).

¶ 46 The law-of-the-case doctrine applies to the remainder of the State's arguments. As no exception to the doctrine applies, we must decline to revisit them.

¶ 47                                   III. CONCLUSION

¶ 48 We reverse the trial court's order granting defendant's amended motion *in limine* to bar evidence of marital communications. We hold that defendant voluntarily waived her marital privilege as to the text messages and e-mails between her and Joe recovered from his phone.

¶ 49 Order reversed.

¶ 50 Cause remanded.

---

**No. 2-19-0412**

---

| | |
|---|---|
| **Cite as:** | *People v. Gliniewicz*, 2020 IL App (2d) 190412 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 16-CF-239; the Hon. James K. Booras, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Michael G. Nerheim, State's Attorney, of Waukegan (Patrick Delfino, Edward R. Psenicka, and Richard S. London, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Donald J. Morrison, of Morrison & Morrison, P.C., and Brian G. Smith, of LaLuzerne & Smith, Ltd., both of Waukegan, and Vasili D. Russis, of Kelleher & Buckley, LLC, of North Barrington, for appellee. |

---